1

1    IN THE UNITED STATES DISTRICT COURT
2      FOR THE SOUTHERN DISTRICT OF ALABAMA
                SOUTHERN DIVISION
3
     RONALD COTTRELL, et al.,
4
         Plaintiffs,
5
         vs.           CASE NO. 16-503-CG-N
6
     CHICKASAW CITY SCHOOLS
7    BOARD OF EDUCATION, et al.,
8        Defendants.
9          * * * * * * * * * *
10    DEPOSITION OF RONALD W. COTTRELL, taken
11   pursuant to stipulation and agreement before
12   Audrey Kirkland, Court Reporter and
13   Commissioner for the State of Alabama at Large,
14   in the Law Offices of Campbell,
15   Duke & Campbell, 851 East I-65 Service Road,
16   Suite 700, Mobile, Alabama, on Tuesday,
17   September 19, 2017, commencing at approximately
18   9:04 a.m.
19          * * * * * * * * * *
20
21
22
23

Page 2

APPEARANCES

1
2
     FOR THE PLAINTIFFS:
3
     Mr. Thomas M. Loper
4    THE GARDNER FIRM
     Attorneys at Law
5    210 South Washington Avenue
     Mobile, Alabama  36602
6
7    FOR THE DEFENDANTS:
8    Mr. Nash Campbell
     Mr. Robert C. Campbell
9    CAMPBELL, DUKE & CAMPBELL
     Attorneys at Law
10   851 East I-65 Service Road
     Suite 700
11   Mobile, Alabama  36606
12
13          * * * * * * * * * *
14
             INDEX
15

16   EXAMINATION BY:                        PAGE
17   CAMPBELL (Nash)...........................4
18
19   EXHIBITS                               PAGE
20   DEFENDANTS' EXHIBIT #90..................76
        Plaintiff Ronald Cottrell's Supplemental
21      Response to Defendants' First Set of
        Interrogatories and Requests for
22      Production
23          * * * * * * * * * *

Page 3

STIPULATIONS

1
2        It is hereby stipulated and agreed by and
3    between counsel representing the parties that
4    the deposition of RONALD W. COTTRELL is taken
5    pursuant to the Federal Rules of Civil
6    Procedure and that said deposition may be taken
7    before Audrey Kirkland, Court Reporter and
8    Commissioner for the State of Alabama at Large,
9    without the formality of a commission; that
10   objections to questions other than objections
11   as to the form of the questions need not be
12   made at this time but may be reserved for a
13   ruling at such time as the deposition may be
14   offered in evidence or used for any other
15   purpose as provided for by the Federal Rules of
16   Civil Procedure.
17       It is further stipulated and agreed by and
18   between counsel representing the parties in
19   this case that said deposition may be
20   introduced at the trial of this case or used in
21   any manner by either party hereto provided for
22   by the Federal Rules of Civil Procedure.
23          * * * * * * * * * *

Page 4

1        RONALD W. COTTRELL
2        The witness, having first been duly sworn
3    or affirmed to speak the truth, the whole
4    truth, and nothing but the truth, testified as
5    follows:
6        THE COURT REPORTER:  Usual stipulations?
7        MR. LOPER:  That's fine.
8        MR. NASH CAMPBELL:  Yes.  Okay.
9             EXAMINATION
10   BY MR. NASH CAMPBELL:
11       Q.  For the record, my name is Nash
12   Campbell and I represent the Chickasaw City
13   Board of Education.  This is Bob Campbell.
14   He's also attorney for the Chickasaw City Board
15   of Education who are the defendants in this
16   lawsuit.
17       Just to go through some preliminary
18   matters, would you please state your name for
19   the record?
20       A.  My name is Ronald W. "Ronnie"
21   Cottrell.
22       Q.  Coach Cottrell, have you ever been
23   deposed before?

Page 5

1    A. I have.
2    Q. Do you mind me calling you Coach or
3 Mr. Cottrell?
4    A. Either one's fine.
5    Q. Okay. Since you've been deposed
6 before, I don't think that there's a whole lot
7 we need to go through but if you need to stop
8 for any reason, for instance, to go to the
9 restroom, or anything like that, please let us
10 know --
11    A. Okay.
12    Q. -- and we can take a break. With
13 that being said, if there's any question
14 currently on the table, will you please answer
15 that and then we can take that break and move
16 on. Do you have any questions of us before we
17 get started?
18    A. No, sir.
19    Q. All right. Thank you.
20    Will you please state your current
21 address?
22    A. My current address is 2835
23 Bennington Drive.

Page 6

1    Q. Is that in Mobile?
2    A. Mobile, Alabama 36695.
3    Q. Is that where you lived when you
4 were employed in Chickasaw?
5    A. No, sir, it was not.
6    Q. Will you tell me that address?
7    A. 124 Baratara Drive.
8    Q. Is that located in Chickasaw?
9    A. It is.
10    Q. Are you currently married?
11    A. I am. My wife's name is Jean.
12    Q. Will you tell me her full name?
13    A. Jean L. Cottrell.
14    Q. What's her maiden name?
15    A. She was a Lee. Jean Lee.
16    Q. L-E-E?
17    A. Yes, sir.
18    Q. Where are you currently employed?
19    A. I'm currently employed at Mobile
20 Christian School.
21    Q. When were you hired by Mobile
22 Christian?
23    A. I don't know the exact date, but I

Page 7

1 began in -- in -- in the summer of 2014. 2015.
2 Excuse me.
3    Q. When did Mobile Christian first
4 contact you about taking a job with them?
5    A. It would have been about a week
6 before I was terminated at that point. And
7 Tommy Wasden contacted me and offered me a
8 position. I told him that if I -- it was just
9 the week before.
10    Q. Before Chickasaw terminated you?
11    A. Yes, sir.
12    Q. And your contact was Tommy Watson?
13    A. Wasden, yes, sir.
14    Q. Wasden?
15    A. W-A-S-D-E-N.
16    Q. And you believe it was about a week
17 before being terminated from Chickasaw?
18    A. That's when he offered me a job,
19 yes, sir.
20    Q. So you knew approximately a week
21 before being terminated from Chickasaw that you
22 might be terminated?
23    A. No, sir, I didn't know. I had no

Page 8

1 clue.
2    Q. Do you know why Tommy Wasden would
3 have offered you that job at that point in
4 time?
5    A. I don't. We've been friends a long
6 time. We've talked about working together
7 before.
8    Q. What was Tommy's position at Mobile
9 Christian at that time?
10    A. Tommy was the president and the head
11 football coach at Mobile Christian School.
12    Q. When did you begin working with
13 Chickasaw City Schools?
14    A. July of 2014.
15    Q. Where did you work prior to working
16 with Chickasaw City Schools?
17    A. Godby High School.
18    Q. And how long did you work --
19    A. Tallahassee, Florida.
20    Q. I'm sorry.
21    A. That's okay.
22    Q. How long did you work with Godby
23 before then?

**Ronald "Ronnie" Cottrell**

**3 (9 - 12)**

Page 9

1   A. From 2010 until the time I started
2   at --
3   Q. So --
4   A. -- Chickasaw.
5   Q. -- roughly 2010 to 2014?
6   A. Yes, sir.
7   Q. Do you recall your salary at Godby?
8   A. Yes, sir. My last year I made
9   approximately $53,000. The year before, I made
10  more. I made 75.
11   Q. Do you know why your salary
12  decreased?
13   A. Yes, sir. And, actually, I'll go
14  back all the way to 2010. I made about 53 the
15  first year I was there, in '10. In '11, they
16  did a after-school program, so I made more in
17  2011 and '12 because of the after-school
18  program.
19   Q. Did they --
20   A. We did not have the after-school
21  program in 2013, is the reason the salary was
22  different.
23   Q. Did they cut the program?

Page 10

1   A. Yes, sir, they did.
2   Q. Do you know why?
3   A. I have no clue.
4   Q. So it wasn't just you being removed
5  from the program?
6   A. The whole -- the whole program, yes,
7  sir.
8   Q. Did you win any awards at Godby as a
9  coach?
10   A. I was the Nike coach of the year
11  2012. We won the state championship there.
12   Q. What was your teaching position at
13  Godby?
14   A. I taught physical education.
15   Q. What was your teaching position at
16  Chickasaw?
17   A. I taught one biology class, first
18  period in the morning, and then the rest of my
19  classes were either P.E., or what I called
20  remediation. And we had students that took
21  online courses, and I think they called it
22  intervention, but -- the -- the school called
23  it intervention -- but I monitored students in

Page 11

1  a -- like a computer lab. I did teach one test
2  prep class.
3   Q. What made you want to leave Godby
4  high school?
5   A. Mainly to be closer to my family.
6  And after -- I've never been recruited to come
7  anywhere like I was by Brent Ward. Brent Ward
8  and the mayor of Chickasaw, several people from
9  that community. And I really felt like it was
10  what I was supposed to do.
11   Q. So did you apply for the coaching
12  position at Chickasaw or did somebody at
13  Chickasaw make initial contact with you?
14   A. I got a call from a gentleman in the
15  community, the fireman at that time, and I
16  can't remember his name. He was one of the
17  boosters at -- at Bryant High School when I was
18  head coach there. He was the fire chief of
19  Chickasaw. And he's the one that asked me to
20  come and talk to Brent Ward. I really just --
21  I stopped by when I was home to see Brent
22  because the fire -- fire -- the fire chief
23  asked me to go by and see him and that's how it

Page 12

1  led to me eventually applying for the job. And
2  when I say I'm home, my home was here in
3  Mobile, Nash. I -- we lived here but I was
4  working at Godby High School in Tallahassee.
5   Q. Who was this fire chief?
6   A. I said a few minutes ago I don't
7  remember his name. But I can see his face.
8   Q. But he called you?
9   A. Yes, sir, he did.
10   Q. And it wasn't an e-mail, though? It
11  was definitely a phone call?
12   A. It was. He encouraged me to apply,
13  said it was a great community. And I agreed
14  with him. I agree now.
15   Q. And he called you before you applied
16  to Chickasaw?
17   A. I don't know if I ever applied. I
18  think I -- I think in the end I came in and
19  filled out an application after I'd already
20  been hired. Yes, sir, before I applied -- I
21  also had another call from a gentleman, a
22  friend of mine in the community, Bud Ratliff
23  contacted me and said I ought to look at the

Page 13

1  job, it was a great school system.
2      Q.  Who was your first contact with the
3  Chickasaw city school system?
4      A.  Brent Ward.
5      Q.  Do you remember when that
6  conversation took place?
7      A.  No, sir.
8      Q.  How did --
9      A.  Not exactly.
10     Q.  I'm sorry.
11     A.  Not exactly, no, sir.
12     Q.  How did that conversation go?
13     A.  I was very impressed with Brent.  I
14 mean, he's a -- he's a fireball.
15     Q.  Do you remember about when that was?
16     A.  No, sir.
17     Q.  Was anyone else involved in that
18 phone call or conversation?
19     A.  No, sir.  But I -- and I will say it
20 was at least a month before I was actually
21 hired there.  I mean, it was a -- at least a
22 month that I was actually hired.
23     Q.  Do you remember the first time you

Page 14

1  ever met a board member?
2      A.  Yes, sir, I do.
3      Q.  Who was that?
4      A.  I met -- I met all of the board
5  members at Mobile Christian school.  Barry -- I
6  say all of them.  A group of them.  Barry
7  Broadhead, Robert McFall, I know those two guys
8  were there just -- just before I started.  Kyle
9  Kallhoff was not on the board but he was there.
10     Q.  Did --
11     A.  And I met with them in a -- in a
12 board -- in a meeting room there at Chickasaw
13 High School.
14     Q.  To clarify, you said Mobile
15 Christian but you mean Chickasaw, right?
16     A.  Did I say Mobile Christian?
17     Q.  Yes, sir.  I just want to clarify
18 for the record.
19     THE WITNESS:  I'm sorry.
20     A.  Yes, sir, in a -- in the Chickasaw
21 High School.  It's on the elementary wing.  It
22 was in a meeting room there.
23     Q.  Okay.  I think we all knew what you

Page 15

1  meant but I --
2      A.  I'm sorry.
3      Q.  -- understand.  When you work for a
4  new board, you want to focus on that board.
5      A.  There you go.
6      Q.  So it was Robert McFall and Barry
7  Broadhead then?
8      A.  They were definitely there.  And I
9  thought Bob Ham was there but I'm not for sure.
10 I'm not for sure.  I know those two men were
11 there.  The mayor was there.
12     Q.  How many years do you need in the
13 teacher's retirement system of Alabama before
14 you obtain full retirement benefits?
15     A.  I have 18 -- I have 18 years in
16 the -- I've thought 18 years in the state of
17 Alabama retirement system.  So to make 25, I
18 needed seven more years.
19     Q.  Prior to working at Godby, where did
20 you work?
21     A.  I started out as a student coach at
22 T.R. Miller High School under my head coach,
23 Frank Cotten, and that was while I was in

Page 16

1  school.  I worked as a student coach at Troy
2  State under Charlie Bradshaw for two years,
3  again, while I was in college.  My first job at
4  age 24, I was head coach at Kinston High
5  School.  While I was at Kinston High School,
6  the superintendent from Escambia County
7  contacted me and asked me to become the head
8  coach at Flomaton High School, which I did from
9  1984 through '87.  The superintendent then
10 asked me after that term at Flomaton, he asked
11 me if I would take the job at W.S. Neal.  His
12 name is David Brantley, asked me if I would
13 take the job at W.S. Neal, that it was an
14 athletic situation.  It was good but they just
15 had some issues within the school that he asked
16 me to help be resolve -- re- -- help to
17 resolve, and I took the job.  So one year at
18 '88 -- in '88, I was at Neal.  While I was at
19 Neal, Bobby Bowden offered me a job.  I became
20 the -- became a graduate assistant at Florida
21 State in '89.  I met Coach Bowden through his
22 football camp.  I worked his camp for four
23 years, that's how he knew me, and Mickey

Page 17

1  Andrews who recruited my school.  So I was at
2  Florida State 1989 until 1997.  Mike Dubose
3  asked permission to talk to me at -- at
4  Alabama.  I interviewed with him and was the
5  head coa- -- well, excuse me -- the assistant
6  head coach at Alabama '98 through 2001.  Had a
7  contract year in 2002.  I did not coach at
8  Alabama, did not coach anywhere.  Began
9  coaching again in 2005 at Ozark, Carroll High
10 School, was there for two seasons, was in
11 business for two years more.  And then I was
12 the head coach at Bryant High School in 2008
13 and 2009; became the head coach at Godby High
14 School in 2010; took the job at Chickasaw in
15 2014, had really hoped that would be my last
16 job.  In 2015, I started at Mobile Christian,
17 have been there ever since.
18     Q.  What position did you play in
19 college?
20     A.  I did not play.  I was a student
21 coach in college.  I coached wide receivers and
22 linebackers at Troy.  I couldn't play dead in
23 football.

Page 18

1     Q.  What does that mean?
2     A.  Couldn't play dead in a cowboy
3  movie, man.  I couldn't -- I just couldn't
4  play.  I was too small and more of a baseball
5  player.
6     Q.  What did you play in baseball?
7     A.  Played outfield, third base.
8     Q.  Well, I'm going to turn our
9  attention to the Complaint in this lawsuit
10 since that's why we're here.
11     A.  Yes, sir.
12     Q.  We can turn to Exhibit 35.  I got my
13 own copy so just going to hand that over to
14 you.  Let's see.  For the record, can you say
15 who the plaintiffs are in this lawsuit?
16     A.  I can.  James Rigdon, Stacey Rigdon,
17 and myself.
18     Q.  And who are the defendants listed?
19     A.  The defendants are Chickasaw City
20 School Board and Kathy Odom, superintendent of
21 Chickasaw City Schools.
22     Q.  And are you aware that the
23 superintendent is no longer a defendant in this

Page 19

1  lawsuit?
2     A.  I think someone told me that.  I
3  believe that.
4     Q.  And are you aware that the
5  superintendent that was named in this lawsuit,
6  Kathy Odom, was not the acting superintendent
7  when you were nonrenewed?
8     A.  Yes, sir.
9     Q.  Are you aware that no other
10 defendants were named in this lawsuit?
11    A.  Yes, sir.  To my knowledge, that was
12 true.
13    Q.  Are you aware that no other
14 defendants can be added to this lawsuit at this
15 point in time?
16    A.  Yes, sir, to my knowledge, I know
17 that.
18    Q.  Do you know the date that the board
19 voted to nonrenew your employment with the
20 Chickasaw city school system?
21    A.  I don't remember the date.  It was
22 in May.
23    Q.  Before I --

Page 20

1     A.  Actually -- excuse me.  I'm not sure
2  what day it was.  It might have been June.  But
3  it was end of the school year.
4     Q.  Before I move to that exhibit, do
5  you recall the board members that were serving
6  during your nonrenewal?
7     A.  I do.
8     Q.  Can you tell me who they are?
9     A.  Yes, sir.  Barry Broadhead.  Bob
10 McFall was the president, I guess, or the
11 leader.  What's the term?  Is it president --
12    MR. BOB CAMPBELL:  (Counsel nodded.)
13    A.  -- of the school board?
14 Mrs. Parker, Bob Ham, and Ms. Grizzle.
15    Q.  Will you turn to Exhibit 46 just for
16 a second?
17    A.  46?
18    Q.  Yes, sir.
19    A.  Yes, sir.
20    Q.  We'll go back to 35 --
21    A.  That's okay.
22    Q.  -- again, but . . .
23    A.  I'm there.  It was in May.  I see.

Page 21

¹ Okay.  Go ahead.
²      Q.  Have you ever seen that agenda
³ before?
⁴      A.  No, sir.
⁵      Q.  Okay.  Well, if you haven't seen it,
⁶ then that's fine.  The only reason why I'm
⁷ showing it to you is to see if it could refresh
⁸ your memory on the date.
⁹      A.  It is.  It's May 21st.  That would
¹⁰ have been the date, yes sir.  It would have
¹¹ been.
¹²      Q.  So is that the date of your
¹³ nonrenewal?
¹⁴      A.  Yes, sir, it is -- it was.
¹⁵      Q.  Do you recall attending the meeting
¹⁶ of the Chickasaw city school system on
¹⁷ May 21st?
¹⁸      A.  I was not there, no, sir.
¹⁹      Q.  Why weren't you there?
²⁰      A.  Because I had been told by counsel
²¹ not to attend.
²²      Q.  Who told you not to attend?
²³      A.  My -- my attorney.

Page 22

¹      Q.  Okay.  So where were you that
² evening?
³      A.  Let me go back.  I want -- I want to
⁴ make sure I say this correctly.  I think it
⁵ was -- I think it was Mr. Beck, my AEA
⁶ representative.  I don't think he's an
⁷ attorney.  Where was I.  I was at my home.  I
⁸ was sitting at my home.
⁹      Q.  Okay.  So Eric Beck told you not to
¹⁰ attend?
¹¹      A.  I think it was Eric Beck, I think.
¹²      Q.  Why did Eric Beck tell you not to
¹³ attend?
¹⁴      A.  I'm not sure.  I just did what I was
¹⁵ told.
¹⁶      Q.  Well, we were told in other
¹⁷ depositions that you were accepting Mobile
¹⁸ Christian's job that evening.  Is that correct?
¹⁹      A.  No, sir, that's not correct.  Not
²⁰ correct.
²¹      Q.  We were also told in other
²² depositions that many people came that evening
²³ to support you.  Is that correct?

Page 23

¹      A.  That is correct.
²      Q.  Did you ask them to come that
³ evening?
⁴      A.  No, sir, I did not.
⁵      Q.  How well did you know Bob McFall?
⁶      A.  I knew Bob pretty well.  He was my
⁷ neighbor.
⁸      Q.  Did you like him?
⁹      A.  I did like Bob.  I -- let me say
¹⁰ this, I respected Bob.
¹¹      Q.  How many conversations do you think
¹² you had with Bob McFall while you were an
¹³ employee at Chickasaw?
¹⁴      A.  Not many because we were told that
¹⁵ we couldn't discuss -- the superintendent said
¹⁶ we couldn't talk to board members.
¹⁷      Q.  Well, other than school board
¹⁸ business, how many conversations do you think
¹⁹ you had with him?
²⁰      A.  Again, Nash, we were -- we were told
²¹ not to talk to them.  We were told that we were
²² not to discuss or visit with board members.  It
²³ was -- it was policy of Mr. Kallhoff's that we

Page 24

¹ were not able to speak to board members.
²      Q.  Did Kyle ever put that in writing to
³ you, not to speak to a board member?
⁴      A.  I think he -- I'm not sure, but I
⁵ think he did actually.  He did it for the
⁶ whole -- the whole system.
⁷      Q.  Was that pertaining to personnel
⁸ issues or just in general?
⁹      A.  It was our understanding we couldn't
¹⁰ talk to them.  But I don't know the number of
¹¹ times -- I do not know the number of times that
¹² I've talked to Bob McFall.  I do --
¹³      Q.  Did --
¹⁴      A.  -- I do remember seeing him a lot in
¹⁵ our neighborhood.
¹⁶      Q.  Did you know Bob McFall prior to
¹⁷ being hired?
¹⁸      A.  I did not.  I met him at that first
¹⁹ meeting in the school.
²⁰      Q.  How did you know Bob well enough to
²¹ respect him?
²²      A.  Just because he loved the community.
²³ Any time there was a function like at the park

Page 25

1  or -- I mean, he was very involved in the
2  Chickasaw community. We -- you saw him more
3  than you ever saw the superintendent or the
4  principal or staff members. I mean, he was
5  involved in the community.
6      Q. How well did you know Barry
7  Broadhead?
8      A. About the same. About the same. I
9  saw him about the same but I -- probably was
10 closer to McFall.
11     Q. Did you like Barry Broadhead?
12     A. I did. I did.
13     Q. I know that this is redundant. But
14 how many conversations do you think you had
15 with Barry Broadhead?
16     A. I don't -- I don't have a way of
17 knowing. I don't know.
18     Q. Were you aware that Bob McFall voted
19 to accept the resignation of Brent Ward?
20     A. Yes, sir, I was.
21     Q. Are you aware that Barry Broadhead
22 voted to accept the resignation of Brent Ward?
23     A. Yes, sir.

Page 26

1      Q. How well did you get to know
2  Elizabeth Grizzle?
3      A. Didn't know her as well. Didn't
4  know her as well but saw her in the school
5  some. Loved her grandson.
6      Q. Did you get to know him?
7      A. He's a great kid. He was elementary
8  football player.
9      Q. Do you recall how old he was?
10     A. Elementary age. I -- I -- not sure.
11     Q. I have a feeling I know the answer.
12 But do you remember how many conversations you
13 had with her?
14     A. No, sir, I don't.
15     Q. Did you like her?
16     A. Didn't know her well enough. I just
17 didn't know her.
18     Q. How well did you get to know Jenny
19 Parker?
20     A. Didn't know her very well either. I
21 had one conversation with her at -- at an event
22 at the -- at the marina down there. She's a --
23 she's a teacher at another public school. Just

Page 27

1  really liked her. But, I mean, I just didn't
2  know her very well. Very impressed with her.
3      Q. How often did you speak with her
4  husband Adam Bourne?
5      A. Not a lot but saw him at games. He
6  spoke to our team once and -- really, really
7  good man. Really good man. Saw him at church.
8      Q. How well do you know Bob Ham?
9      A. I know Bob really well. Bob was on
10 the -- I don't remember exactly what the event
11 was. I think it was the night of the board
12 meeting when I was introduced, I met Bob. Just
13 great Christian man. I consider Bob to be a
14 friend.
15     Q. So how many conversations do you
16 think you had with Bob Ham while you were an
17 employee?
18     A. More than any other -- more than any
19 other of the board members but I don't know.
20 I'm not sure.
21     Q. So Kyle's policy didn't really
22 affect you talking to Bob Ham?
23     A. No, it did. It did. It just

Page 28

1  limited it. I mean, it -- we still ran into
2  each other a lot. Bob was really involved in
3  the community, that's where I saw him the most.
4  And -- which I -- I spoke to him.
5      Q. When did your brother hire Bob Ham
6  to work in his pharmacy?
7      A. I don't know that -- I don't know
8  that my brother hired him. I think he actually
9  began to work with a different group. He
10 worked with a young man out of Dothan. I don't
11 really have a lot of knowledge about it. But
12 it was sometime -- I'm not sure it was -- it
13 was during the school year at -- while I was at
14 Chickasaw.
15     Q. So that was before you were
16 nonrenewed?
17     A. Yes, sir, it was.
18     Q. Isn't it true that Bob Ham's one of
19 the board members that voted to not nonrenew
20 you?
21     A. I guess it is, yes, sir.
22     Q. Will you refer to Exhibit 47,
23 please?

Page 29

1    A. Yes, sir.
2    Q. Have you ever seen that document?
3    A. No, sir.
4    Q. Okay. If you can't authenticate it,
5 that's fine.
6    A. I can say that it's a called board
7 meeting from May 21st.
8    MR. NASH CAMPBELL: Tom, it's the
9 minutes from that board meeting.
10    A. Meeting minutes. But I've never
11 seen before.
12    Q. If you can't identify it, it's okay.
13 We can move on.
14    MR. LOPER: It speaks for itself.
15    MR. NASH CAMPBELL: Yeah.
16    Q. (By Mr. Nash Campbell) Do you know
17 if Bob Ham still works at Grand Bay Pharmacy?
18    A. I don't think he works at Grand Bay
19 Pharmacy. In fact, I don't even know what
20 entity he works for. I'm not involved with
21 that. But he does work in the same position.
22 He -- what he does is he does -- he -- in a
23 pharmacy, you have the back part of the

Page 30

1 pharmacy and you have the front. And what he
2 does is he works on the front end of the
3 pharmacies. My brother has multiple pharmacies
4 and he works for him as far as working on the
5 front side like circulars and whatever's on the
6 front part of the pharmacy, not what the
7 druggist does in the back. You follow what
8 I'm -- what I'm talking about?
9    Q. Like advertisement and stuff like
10 that?
11    A. Advertisement. And like anything
12 that sold in the front that's not of
13 prescription nature. That's my knowledge of
14 what he does. But I will tell you he's a great
15 man. I think the world of Bob.
16    Q. So how often do you still
17 communicate with him?
18    A. Not much. Especially since -- since
19 we've been involved in this situation.
20    Q. Are you aware that Bob Ham recently
21 resigned from the board?
22    A. I learned that this week.
23    Q. Well, I want to move back to the

Page 31

1 Complaint, if that's all right with you,
2 Exhibit 35.
3    A. Yes, sir.
4    Q. Go to page 3 in the Complaint, and
5 around paragraph 13.
6    A. 13, sir?
7    Q. Yes, sir.
8    A. Yes, sir. On or about
9 September 21st, 2014, C███████ was standing in
10 the school's hallway talking to his teacher,
11 Stephanie Serra. Is that where I'm supposed to
12 be?
13    Q. Yes, sir.
14    A. Okay.
15    Q. Do you recall September 21st, 2014?
16    A. I do. On or -- I -- on or about. I
17 remember the incident that which -- you're
18 talking about.
19    Q. You remember that day?
20    A. I do.
21    Q. Did you personally aid in drafting
22 this Complaint?
23    A. Yes, sir, I did.

Page 32

1    Q. Did James Rigdon and Stacey Rigdon
2 also aid in drafting the Complaint?
3    A. You would have to ask them. I -- we
4 met separately.
5    Q. Okay. Did you get to review it
6 before it was filed?
7    A. I did.
8    Q. So back on September 21st, 2014,
9 your Complaint states that Brent Ward, the
10 school's principal, and Ricky Ruffin, athletic
11 director, walked up behind C███████ R██████ and
12 then Ward hit C███████ on the back of his head.
13    Did you provide the statement for that
14 allegation?
15    A. I wrote -- I gave a written
16 statement, which y'all've produced into
17 evidence, what I saw. Yes.
18    Q. So that allegation is 100 percent
19 accurate?
20    A. That Ward hit C█████ on the back
21 of the head?
22    Q. That Brent Ward and Ricky Ruffin
23 walked up behind C███████ and Ward hit him on

Page 33

1  the back of the head?
2     A.  I don't know about walking up
3  behind.  All I saw was Mr. Ward hit C███████,
4  yes.
5     Q.  All right.  And then your Complaint
6  states that Ward then hit C██████ a second
7  time, this time on top of his head, and that
8  Ward continued to hit C██████ a third time on
9  the side of his face.  And the Complaint states
10 that you witnessed this incident.  Does that
11 allegation accurately represent what you
12 witnessed?
13    A.  I did witness it.  But -- yes, I did
14 witness it.
15    Q.  Was a board member present for any
16 of that incident?
17    A.  No, sir.
18    Q.  Will you look at paragraph 16?
19    A.  Yes, sir.
20    Q.  Paragraph 16 states that Coach
21 Ruffin responded to the incident by taking
22 C████████ outside of the school building and
23 instructing C██████ not to tell his father

Page 34

1  what had occurred.  It further states that
2  Ruffin then went to the classroom of C██████'s
3  father to inform him of the incident and to
4  tell him that he had taken care of it.
5     Is that accurate?
6     A.  You'd have to ask Coach Rigdon that
7  question.  I wasn't there for that part.
8     Q.  So you didn't have any knowledge of
9  that?
10    A.  Only what I was told by Ruffin and
11 Rigdon, both of those guys.
12    Q.  So do you have any knowledge of a
13 board member instructing Ruffin to do any of
14 that?
15    A.  No, sir.
16    Q.  Paragraph 18 of this Complaint
17 alleges that Willie Lewis, the school's
18 assistant principal, approached you about the
19 incident after school let out that day and that
20 Lewis told you that you needed to calm James
21 Rigdon down and that the Rigdons did not need
22 to press charges.
23    Can you tell me about that conversation?

Page 35

1     A.  Just that he told me exactly what he
2  said right there, that I needed to calm James
3  Rigdon down and they did not need to press
4  charges.
5     Q.  Where did this take place?
6     A.  It happened on the football field at
7  our school.  He sat in the cart with me.
8     Q.  In a cart?
9     A.  In a golf cart, yes, sir.
10    Q.  About what time of day was this?
11    A.  During practice after school.
12    Q.  What was Willie Lewis's tone?
13    A.  He seemed -- he -- to me, he -- I
14 would say frantic is probably the best way to
15 put it because -- very emotional.  He then
16 walked away from me.  He brought Jamie Rigdon
17 over to him.  He was within 15 feet of me.  And
18 basically told him if he was going to stay
19 here, he needed to let this go.  We needed to
20 move on and let this go if he was going to --
21 if he's planning on staying here, you need to
22 let it go.
23    MR. LOPER:  To let y'all know, I'm

Page 36

1  making coughing sounds and stuff.  I'm not
2  signalling.  I'm getting over a cold, so.
3     MR. NASH CAMPBELL:  That's fine.
4     MR. LOPER:  That's why --
5     MR. NASH CAMPBELL:  I didn't --
6     MR. LOPER:  -- I've got --
7     MR. NASH CAMPBELL:  -- even notice.
8     MR. LOPER:  -- a Kleenex by me.
9     MR. NASH CAMPBELL:  That's fine.
10    Q.  (By Mr. Nash Campbell) How did Lewis
11 approach you to start this conversation?
12    A.  Just walked out.  I mean, actually,
13 he came walking across the field.  I spotted
14 him and (indicating), just signalled with his
15 left hand for him -- for me to come to him.  So
16 I pulled over to where he was and he got in the
17 cart with me.
18    Q.  And where did y'all have practice --
19 or had -- where did you have practice at
20 Chickasaw?
21    A.  There's a football practice field to
22 the left.  If you're facing the school, it's on
23 the left side of the school.  That's where we

Page 37

1 were. So he came walking from the school,
2 out -- came walking out in the middle of the
3 practice field. First of all, he'd never been
4 there. I mean, he don't -- he rarely came to
5 our practice field so I knew something was up.
6 I didn't know what it was. He was striding
7 pretty quick, so.
8       Q. You said he was frantic. Did he
9 stutter? Did he blink?
10      A. No. No. Frantic might not have
11 been the word but he was very emotional. I
12 mean, he was -- it wasn't like the conversation
13 we're having right now, you know, professional.
14 He was -- I mean he was concerned. He was very
15 concerned about the situation.
16      Q. Was it raining that day?
17      A. No, sir. Not that I remember.
18      Q. Anything else about the conversation
19 that seemed odd or -- or unusual?
20      A. No, sir.
21      Q. And is that pretty much the extent
22 of your words, what the allegation states?
23      A. That's all I can recall right now.

Page 38

1 Yes, sir.
2       Q. Did you think to say anything else
3 back to him about the incident, about maybe we
4 should be calling the police or anything like
5 that?
6       A. No, sir. All I said was he
7 shouldn't've hit him. Said the man
8 shouldn't've hit him.
9       Q. All right. That paragraph of the
10 Complaint also says that you replied to Lewis,
11 Really shouldn't hit him, just like you're
12 stating. Are those your exact words?
13      A. It's been -- it's been a long time.
14 But I just -- I think I said to him that he
15 should not have hit him, that from the very
16 first year I taught -- was brought in to the
17 teaching profession, I was taught not to put
18 your hand on a student for any reason. And he
19 should not have hit C██████. But I -- I don't
20 know. He mostly was talking. And I think he
21 was more interested getting with Jamie than he
22 was getting with me, which he did.
23      Q. So why do you think he went to you

Page 39

1 first instead of Jamie?
2       A. Because I think -- now, this is just
3 what I think. Okay. You've given me a
4 question. It's just my opinion that he knew I
5 could calm Jamie down. Jamie's a -- Jamie's a
6 big man and a -- got a great heart,
7 soft-hearted guy, but I think he knew he would
8 need my help as far as calming him down, which
9 I had already done. I had tried to get him
10 to -- to just let -- just be calm and not do
11 anything rash, which he didn't. To his -- his
12 credit, he didn't. But I think the reason he
13 asked me to do it is because he felt like he
14 was going to need some help in getting this
15 done.
16      Q. When you said that he should haven't
17 hit a student, did Lewis respond at all to that
18 comment?
19      A. He just kept saying that if he wants
20 to stay here, he needs to calm down and let
21 this thing go.
22      Q. So he said that to you as well?
23      A. I said that earlier. I said that

Page 40

1 earlier. I said that he needs to -- whatever I
2 said earlier, is what he said. I'm looking at
3 what he said -- I heard him say to Jamie. But
4 he just said, He needs to let this thing go; he
5 needs to calm down and let this thing go. And
6 I think he did say, If he wants to stay here,
7 he needs to calm down.
8       Q. Do you have any knowledge if a board
9 member told Lewis to tell you to calm James
10 Rigdon down?
11      A. I don't think so. I don't -- I
12 wouldn't have any knowledge of that.
13      Q. Do you have any knowledge if Lewis
14 was told by a board member to tell you to tell
15 the Rigdons not to press charges?
16      A. No, sir. I don't have knowledge of
17 that.
18      Q. I'm referring to paragraph 19 now of
19 your Complaint. It states like we're -- we
20 touched on earlier that Lewis confronted James
21 Rigdon at the same football practice, I assume,
22 that day where he allegedly stated, quote, Word
23 for the wise, if you want to stay, you need to

Page 41

1 let it go.
2     A. I heard him say that. I did.
3     Q. You did witness that statement?
4     A. I did. I told you a few minutes ago
5 I was 15 -- 10-15 feet from him when he said it
6 to him.
7     Q. What was James Rigdon's reaction
8 when he stated that?
9     A. I couldn't hear him after that. I
10 pulled away. I -- I should have stayed there
11 but I just pulled away. I -- I was trying to
12 run practice.
13     Q. How would you have reacted if
14 somebody had said that to you after somebody
15 hit your son?
16     MR. LOPER: Objection. That's
17 irrelevant.
18     A. I'm not sure. I'm not sure what I
19 would have done.
20     Q. You know Jamie Rigdon pretty well,
21 don't you?
22     A. I do.
23     Q. Do you think Jamie Rigdon would have

Page 42

1 reacted well to someone telling him that?
2     A. He was not happy, now. He was not
3 happy. But, again, I said just a few minutes
4 ago under oath, I was very proud of Jamie. I
5 thought Jamie was very calm and was very
6 professional in this situation. But, now, I
7 don't -- I don't know that Jamie was angry with
8 Willie Lewis. I don't know that even Willis --
9 Willie coming out there -- it probably meant a
10 lot to Jamie that Willie even came out there,
11 Nash, but just to check on him. It probably
12 meant a lot. But he was angry with Brent. I
13 mean, he was angry with Brent Ward. So -- but
14 yes, to answer your question, as a parent, no
15 one wants their child to be struck. And it
16 probably would be a very difficult thing. But
17 I don't know how I would have responded.
18     Q. But you said you didn't get to hear
19 any of his reaction?
20     A. Only at the beginning of the
21 conversation when -- when I saw that Jamie was
22 going to be calm and that Willie Lewis said
23 what he said. I don't know what happened after

Page 43

1 that, no, sir. Maybe you could ask Jamie.
2 He'll fill it in for you.
3     Q. Moving on to paragraph 20 of the
4 Complaint, it states that you got to meet with
5 Brent Ward the day after this incident
6 occurred, and you suggested that Brent Ward
7 apologize but Ward told you that he's -- was
8 refusing to apologize. Can you tell me about
9 that conversation?
10     A. Well, when I -- when I visited with
11 him in his office, I told him that Jamie was
12 still very upset about it. In fact, he brought
13 me in to ask me -- he brought me in there to
14 ask me what -- how Jamie was doing. And I told
15 him that Jamie was -- was calmed down but
16 that -- in my opinion, that he should apologize
17 to the guy. And he told me, I'm not
18 apologizing to him. He said, I'm not
19 apologizing to him.
20     Now, there was a meeting later that
21 Jamie and Mr. Ruffin and Mr. Ward met but I do
22 not know what happened. You'd have to ask
23 Jamie what happened there. But at that point,

Page 44

1 Brent Ward told me he was not going to
2 apologize to them.
3     Q. So you said this was in Ward's
4 office and Ward asked you to come meet him?
5     A. He did.
6     Q. About what time of day was that?
7     A. I'm not sure. It was in the
8 morning, though.
9     Q. What was Brent's demeanor?
10     A. Brent had a pretty big ego. And all
11 I remember is he was sitting up -- he was
12 sitting back in his chair and it was like
13 (indicating). It was more like this
14 (indicating), like, I can't believe I'm having
15 to talk to you about this. But --
16     MR. LOPER: Coach, keep in mind that she
17 can't type what you're gesturing. So if you
18 gesture, just explain what you're doing.
19     THE WITNESS: Okay.
20     A. Well, he just was sitting very
21 upright in his chair. His teeth were gritted.
22 And he -- he just said he wasn't going to do
23 it. But after talking to him a little bit, I

Page 45

1 felt like I had chipped away a little bit.
2 And -- but I -- I -- again, I don't know to
3 this day if he ever did.
4     Q.  Were there any windows to Brent
5 Ward's office?
6     A.  Yes, sir.  There was one in the
7 back.
8     Q.  Could anybody see in during this
9 meeting?
10     A.  If the blinds were open, they could.
11 But I don't know if they were open or not.
12     Q.  While I'm thinking about it, was
13 there anybody in earshot of your conversation
14 with Lewis and you at practice?
15     A.  There was a bunch of guys, but I
16 don't know who might have been there.  I don't
17 know.  I know I heard it.
18     Q.  Were they students or coaches?
19     A.  It could have been both.  It could
20 have been both.  I mean, we're at practice,
21 Nash.  You might -- you might ask Jamie that
22 question 'cause he could probably tell you who
23 was closer to him.

Page 46

1     Q.  Did Ward get threatening to you at
2 any point during his conversation with you?
3     A.  No, sir, not at that -- not that
4 day.
5     Q.  Did he say anything about people
6 needing to let it go or else they're going to
7 get fired or anything like that?
8     A.  Not that day, no, sir.
9     Q.  Your Complaint also states that
10 Jamie Rigdon got to view some film of the
11 incident occurring.  Did you ever get an
12 opportunity to see that film?
13     A.  No, sir.
14     Q.  Did Jamie ever get to describe it to
15 you?
16     A.  No, sir.
17     Q.  Paragraph 22 of the Complaint states
18 that you and James Rigdon reported the incident
19 to board president Bob McFall.  I got a few
20 questions about this.  Did you report it
21 together?
22     A.  No, sir.
23     Q.  So when and where and how did you

Page 47

1 report it to Bob McFall?
2     A.  I drove to his house and sat down at
3 the -- well -- all right.  I'll just say it
4 this way.  I drove to his house.  I called him
5 on his phone and asked him if I could come down
6 and see him.  He said sure.  So I drove down to
7 his house.  I sat on one of the bar stools in
8 his kitchen and he sat down on the bar stools.
9 And he had already heard from someone.  He
10 already knew.  But he asked me to talk about
11 what happened, and we did.  And he was really,
12 really concerned and upset about it.  I mean,
13 he was -- I mean, just really, really upset.
14 But -- but I told him that night that it took
15 place.  The reason I went -- the reason I
16 called him and the reason I went to his house
17 is because I had called Kyle Kallhoff that day.
18 That afternoon I had called Kyle before I went
19 to practice and asked to speak to him.  And
20 whoever the person was on the line, the lady, I
21 don't know if -- I don't know who it was, but
22 she said that Mr. Kallhoff said just to go
23 ahead and get with Brent Ward and tell him what

Page 48

1 happened and he'd get back with me.  He'd get
2 back with me.  He'd follow up with Brent.  He'd
3 follow up with Brent.  Well, at that point, I
4 was trying to call to report something Brent
5 did.  I just didn't feel comfortable continuing
6 to try to do it.  I was trying to set up a time
7 for me to come see Kyle, and he told me to see
8 Brent.  So that -- at that time, I called the
9 president of the board who I did have great
10 respect for, Bob McFall.  And Bob said, Sure,
11 come down and see me.  I told him what
12 happened.
13     Q.  So this was at Bob McFall's house?
14     A.  Yes, sir.
15     Q.  Do you remember when this was?
16     A.  It was -- it was after the fact.  I
17 don't know the exact date.  I don't know what
18 date it was.
19         (Brief interruption due to fire
20          alarm testing.)
21     Q.  Sorry.
22     A.  That's okay.
23     MR. NASH CAMPBELL:  Is that coming

Page 49

¹ through bad on --

² THE COURT REPORTER: No. I'm good.

³ MR. LOPER: Let's take a restroom break

⁴ while we do that because I know it's going to

⁵ take a minute.

⁶ (Brief recess)

⁷ Q. (By Mr. Nash Campbell) What date you

⁸ and McFall met at his house.

⁹ A. And I said I wasn't sure.

¹⁰ Q. You weren't sure, yeah.

¹¹ A. But it was definitely later. I

¹² don't know when it was. It was -- it was later

¹³ than that. But he was -- he was very cordial

¹⁴ and always was. I mean, like I said, I got

¹⁵ great respect for him 'cause -- that's why I

¹⁶ contacted him.

¹⁷ MR. BOB CAMPBELL: Did you say you

¹⁸ contacted him that same night, same night of

¹⁹ the incident?

²⁰ THE WITNESS: No. That's what I just

²¹ said. I don't think it was the same night. It

²² wasn't the same night. That's why I said I

²³ don't think it was. I had tried to call --

Page 50

¹ contact Kallhoff on the day of the event. But

² I think it was later that I contacted McFall.

³ I'm not for sure what day it was.

⁴ Q. (By Mr. Nash Campbell) Do you

⁵ remember what phone number or where you tried

⁶ to contact Kyle?

⁷ A. From the school office, from the

⁸ school phone.

⁹ Q. Do you remember about what time of

¹⁰ day that was?

¹¹ A. I said earlier it was in the

¹² afternoon.

¹³ Q. Afternoon? You have any idea about

¹⁴ how long after the incident with Brent Ward

¹⁵ this was?

¹⁶ A. You talking about when I called

¹⁷ Kyle?

¹⁸ Q. Yeah.

¹⁹ A. It was that day.

²⁰ Q. That day? Do you know if Jamie

²¹ tried to call Kyle that day?

²² A. You'd have to ask Jamie. I don't --

²³ don't know if he did or not.

Page 51

¹ Q. So as far as the rest of that

² allegation in paragraph 22 about Jamie Rigdon,

³ I just have to ask Jamie?

⁴ A. I don't know if Jamie contacted Bob

⁵ McFall. But I did, yes, sir. I reported it to

⁶ him.

⁷ Q. And what was Bob McFall's response?

⁸ A. He was very concerned. He just said

⁹ he would look into it.

¹⁰ Q. You don't remember his exact words?

¹¹ A. No, sir.

¹² MR. LOPER: Are we all going to burn?

¹³ MR. BOB CAMPBELL: I think we ought to

¹⁴ stop and take a little break. What do you

¹⁵ think?

¹⁶ MR. NASH CAMPBELL: Yes. It is kind of

¹⁷ frustrating.

¹⁸ MR. BOB CAMPBELL: It's a little hard

¹⁹ for you to concentrate with an alarm that's

²⁰ still going on.

²¹ (Off-the-record discussion)

²² Q. (By Mr. Nash Campbell) Did Bob

²³ McFall mention if he was personally going to

Page 52

¹ handle anything about this issue?

² A. He didn't. He didn't. But, Nash,

³ again, the man is -- he's hands-on in that

⁴ community, and I felt like he would. I

⁵ believed he would. When he said he was going

⁶ to look into it, I knew he would.

⁷ Q. Do you remember how specific you

⁸ were with what you told Bob McFall about the

⁹ incident?

¹⁰ A. Just that it happened and that there

¹¹ was just a lot of concern, a lot of parents

¹² were concerned about that situation and that

¹³ Rigdon, the Rigdons were really upset about it.

¹⁴ I didn't -- just told him what happened.

¹⁵ Q. Earlier you said that you called

¹⁶ Kyle -- or tried to call Kyle that -- the day

¹⁷ that the incident occurred, correct?

¹⁸ A. Yes, sir. Later that afternoon,

¹⁹ yes, sir.

²⁰ Q. But you're not sure when you went to

²¹ Bob McFall's house?

²² A. No, sir. And I said that when you

²³ first asked me. I said I really wasn't for

**Ronald "Ronnie" Cottrell**                                    **14 (53 - 56)**

Page 53

1  sure exactly when I went to Bob's.  I -- it
2  was -- it was later.  And I was -- hoped to --
3  had hoped to get Kyle again.  I'd hoped to
4  catch him before.  But, finally, I just went
5  ahead to see Mr. McFall.
6      Q.  Can you give me an estimate of about
7  how long after?
8      A.  I don't -- I don't even know.  It's
9  been a long time ago.  But it's -- I just know
10  that I needed to make sure that I reported it.
11  And -- so I went through the -- the -- I went
12  through the procedures as best I could.
13      Q.  Did Bob seem to side with Brent Ward
14  on this issue?
15      A.  No.  He was very professional, but
16  he was concerned about it.  He was concerned
17  about the incident.  I mean, it was -- you
18  know, something had happened in our school and
19  he obviously was concerned.  But no, he
20  didn't -- he wasn't like angry at -- he wasn't
21  angry with anybody.  He just said that he was
22  going to look into it.  He was very proud of
23  that school.

Page 54

1      Q.  Did Bob say that anybody needed to
2  keep quiet about this issue?
3      A.  No, sir, he did not.
4      Q.  Did Bob say anybody -- if people
5  weren't quiet about it, they were going to get
6  fired?
7      A.  No, sir, he did not.
8      Q.  Did Bob threaten your job in any way
9  at that point in time?
10      A.  No, sir, he did not.
11      Q.  Did he make you feel like you were
12  going to be harassed if you didn't keep quiet?
13      A.  Didn't get that impression from him.
14  I -- I -- I was under the impression he was
15  going to try and look into it and see what was
16  going on.
17      Q.  Did you ever have another
18  conversation with Bob McFall about this
19  incident?
20      A.  No, sir, not about it.
21      Q.  All right.  Moving on to paragraph
22  24 of your Complaint, states that
23  superintendent Kallhoff called you to determine

Page 55

1  if it was true that Principal Ward hit Ch█████
2  Rigdon and that you confirmed to Kallhoff that
3  you witnessed Ward hit C█████.  Do you
4  remember what date that conversation was?
5      A.  I don't.  But he called me and he
6  says, Coach I hate to bother you, he said, but
7  I've had something to come to my attention that
8  I need to ask you.  He said, Is it true that
9  Brent Ward hit C█████ War-- -- C█████
10  Rigdon -- excuse me -- C█████ R████ at
11  football practice.  I said, No, sir, that's not
12  true.  But I did witness Brent hit C█████
13  outside of Ms. Serra's class.  And . . .
14      Q.  Do you remember the rest of the
15  conversation, how it went?
16      A.  Just that -- I could hear crickets
17  chirping.  I mean, it was just -- I mean, I
18  don't think that -- I don't think he was ready
19  for it.  I don't -- you know, Kyle -- I think
20  Kyle was caught off guard by it.  I think it
21  was a surprise for him.  I'm not sure but it
22  just appeared -- it just seemed that way.  He
23  told me that he would come by and see us and we

Page 56

1  would talk about it.  And later on, he asked me
2  to do a written statement on it.  But it was a
3  lot longer.  It was a lot longer than that.  It
4  was a good deal of time passed before he asked
5  me for a written statement.
6      Q.  What time of day was that phone
7  call?
8      A.  I don't remember.  I just remember
9  having a conversation.  For some reason, I just
10  think it was at nighttime but I don't -- I
11  don't remember.
12      Q.  I know you said you don't know what
13  date the conversation was.  But, you know, how
14  long after the incident it was, give or take,
15  when that con- -- that phone call --
16      A.  I don't.  I don't remember.
17      Q.  That allegation goes on to say --
18      A.  But -- but I --
19      Q.  I'm sorry.  Go ahead.
20      A.  I'm sorry to interrupt you.  But I
21  will say that I do remember there was a lot of,
22  you know, parents and people in that
23  neighborhood where I lived and peop- -- people

**Freedom Court Reporting, Inc**                    **877-373-3660**

Page 57

1 finding out about it and they were -- and it
2 was like, I cannot believe this guy hit this
3 student. I mean, it was, like, you know,
4 parents were coming to my house and this and
5 that. And -- but it wasn't before that. It
6 was after that. I think -- I don't know how he
7 learned of it. But it was -- it was a little
8 bit of time passed before I got that call from
9 him.
10     Q. That allegation goes on to state
11 that Kyle told you that Ward was doing a great
12 job and he was not going to investigate the
13 incident with C_____?
14     A. That is true. But it was later.
15 Again, it was later. But, to my knowledge, I
16 don't know if he -- if it was a complete
17 investigation or not. I don't -- don't know if
18 he ever did or not.
19     Q. Did Kyle specifically tell you that
20 Ward was doing a great job?
21     A. He said that many times to me.
22     Q. But during the phone -- or during
23 the call when you were telling him that he hit

Page 58

1 someone, he did say that Ward was doing a great
2 job?
3     A. No. That -- that wasn't -- that
4 wasn't at that time.
5     Q. Did Kyle specifically tell you he
6 wasn't going to investigate the incident?
7     A. He told me he didn't know if he was
8 going to investigate the incident or not. And
9 I -- I led to believe -- I was led to believe
10 that he wasn't going to investigate it. This
11 was later -- this was even later than the call
12 when he called me.
13     Q. Kyle actually interviewed you about
14 the incident with C_____ r R_____ didn't he?
15     A. All he asked me for was a written
16 statement, and that was much later. This was
17 much later than this.
18     Q. So this phone call was before your
19 written statement was solicited?
20     A. It was.
21     Q. Will you turn to Exhibit 57?
22     A. (Witness complies.)
23     Q. Do you recognize that document?

Page 59

1     A. I do. That was my written
2 statement.
3     Q. And what's the date on that
4 statement?
5     A. 10/27/14.
6     Q. That's the statement that Kyle
7 solicited from you about the incident?
8     A. Yes, sir. This was, I guess, when
9 he put it in writing.
10     Q. Will you look at Exhibit 58?
11     A. (Witness complies.)
12     Q. Have you ever seen that statement?
13        (Pause while witness reviews
14         document.)
15     A. No, sir. What is this? Who is the
16 statement of?
17     Q. Well, with your attorney present, I
18 don't want to influence you to identify a
19 statement --
20     A. I -- no, I --
21     Q. -- you've never read.
22     A. Let me just answer this question.
23 I've never -- that must have been Ruffin's

Page 60

1 statement because he says Ms. Serra. I -- let
2 me just read it if you don't mind.
3     MR. LOPER: That's fine with me.
4     MR. NASH CAMPBELL: All right.
5        (Pause while witness reviews
6         document.)
7     A. Yes, sir, that's Ruffin. That's
8 Ricky Ruffin's statement, but I've never seen
9 it until today.
10     Q. What's the date at the top corner of
11 that page?
12     A. October 27th.
13     Q. What is Exhibit 60? I'm not sure if
14 that's the --
15     A. Kyle Kallhoff.
16     Q. I'm sorry. It might be 56, then,
17 that I'm looking for. Sorry.
18     Have you ever seen that statement
19 before?
20        (Pause while witness reviews
21         document.)
22     A. That's Stephanie Serra's statement,
23 but I haven't seen it until today.

Page 61

¹     Q.  So were you aware that Kyle Kallhoff
²  did an investigation regarding the C█████
³  R█████/Brent Ward incident?
⁴     MR. LOPER:  Objection to form.
⁵     A.  Well, I do see that he did an
⁶  investigation, but this was a -- more than a
⁷  month after.  And the day that he came to get
⁸  the statement from me was a very hurried thing,
⁹  so -- but he did one.  All of our statements
¹⁰  are dated the same day.  So he must have done
¹¹  this pretty quick at -- at a later time.
¹²     Q.  All right.  Let me go back to
¹³  Exhibit 35, please.
¹⁴     A.  What?  35?
¹⁵     MR. LOPER:  Complaint.
¹⁶     Q.  Yes, sir, it's the Complaint.
¹⁷     A.  Okay.  What page, sir?
¹⁸     Q.  Paragraph 25.  I'm not sure which
¹⁹  page that is.
²⁰     A.  It's page 4.  Okay.
²¹     Q.  And that paragraph states that with
²²  no investigation by the board or Superintendent
²³  Kallhoff, Stacey Rigdon reported the incident

Page 62

¹  to the superintendent of the Alabama State
²  Department of Education.
³     Do you know what date Stacey Rigdon
⁴  allegedly filed a complaint with the state
⁵  department of education?
⁶     A.  No, sir.  You'd have to ask Stacey
⁷  Rigdon.  I don't know.
⁸     Q.  Earlier you said you're pretty close
⁹  with the Rigdons, didn't you?
¹⁰     A.  I didn't say that.  I didn't say
¹¹  that at all.
¹²     Q.  You communicate with Jamie Rigdon on
¹³  a regular basis?
¹⁴     A.  Jamie was an assistant coach.  But
¹⁵  no, I don't -- I mean, Jamie's a friend but
¹⁶  we're not -- I mean, we didn't do things
¹⁷  together.  Jamie was the head baseball coach.
¹⁸  He was hired as the head baseball coach.  His
¹⁹  wife worked in the Special Ed Department.  I
²⁰  saw them a lot.  Wouldn't say that, you know,
²¹  our families tied together.  I have a lot of
²²  respect for Jamie and Stacey, but we weren't
²³  like best friends.

Page 63

¹     Q.  Do you recall the date that Brent
²  Ward was placed on administrative leave?
³     A.  I don't know the date.  I do
⁴  remember -- I -- I remember in my mind the day
⁵  it happened because I was -- I was shocked that
⁶  he resigned later.  But not sure that I even
⁷  knew that he was put on leave.  I just don't
⁸  remember.
⁹     Q.  Paragraph 28 of your Complaint
¹⁰  states that on or about November 3rd, 2014,
¹¹  C█████  R█████, with the support of parents,
¹²  James and Stacey Rigdon, filed a complaint with
¹³  the Chickasaw City Police Department against
¹⁴  Brent Ward for Ward hitting him.  Do you know
¹⁵  why █████ waited so long to file a police
¹⁶  report against Brent Ward?
¹⁷     A.  Do you want me to speculate or do
¹⁸  you want me to --
¹⁹     Q.  Yes, sir.
²⁰     A.  Okay.  I don't know but I just think
²¹  that he had hoped something would be done at
²²  the school.  I think -- I think probably he
²³  just was hoping they would get some help from

Page 64

¹  the school and I guess they didn't think they
²  got what they wanted so they went to the
³  police.  I wasn't involved in that.  You
⁴  might -- it might be better to ask Jamie Rigdon
⁵  or Stacey, Nash, they might could help you on
⁶  that.
⁷     Q.  Will you turn to Exhibit 53, please?
⁸     A.  Yes, sir.  You said 54?
⁹     Q.  53.
¹⁰     A.  Oh, I'm sorry.  Yes, sir.
¹¹     Q.  Have you ever seen that document?
¹²     A.  No, sir.  But it -- I will verify
¹³  that it's the e-mail -- or a letter sent to
¹⁴  Brent Ward for his paid administrative leave.
¹⁵     Q.  And what date was that?
¹⁶     A.  October 29th.
¹⁷     Q.  And according to the Complaint, the
¹⁸  Rigdon's filed their police report on
¹⁹  November 3th of 2014; is that correct?
²⁰     A.  You -- you -- is that -- yes, sir.
²¹  Is that what . . .
²²     Q.  I'm just trying to put some dates --
²³     A.  I said -- I said earlier that I

Page 65

1  don't think that I knew the date. But if you
2  say it's November the 3rd -- is that what
3  you're saying? You're saying on November 3rd
4  is when they filed the Complaint?
5      Q. Yes, sir.
6      A. Okay. I --
7      Q. Just according to the Complaint.
8      A. Okay. Thank you.
9      Q. Did you provide witness testimony on
10 behalf of C██████as a victim in his criminal
11 case?
12     A. On behalf of him? I don't think it
13 was on behalf of anybody. I was subpoenaed
14 to -- by Mrs. -- she's a judge now in
15 Chickasaw. She was the attorney for C█████.
16     Q. Is it Ella Byrd?
17     A. Ms. Byrd. Ms. Byrd subpoenaed me
18 to -- to be a witness. And I cooperated fully
19 with that and the one in Mobile. So you -- I
20 did testify, but I -- I just told what I saw.
21     Q. In circuit court in Mobile County,
22 what was the outcome of that case?
23     A. In Mobile County?

Page 66

1      Q. Yes, sir.
2      A. They found in favor of Brent Ward.
3      Q. So was he found not guilty?
4      A. I'm not sure. I just know
5  that . . .
6      Q. Do you recall whether or not the
7  judge mentioned if he believed your testimony
8  in circuit court?
9      MR. LOPER: Objection. That's
10 irrelevant.
11     But you can testify to it.
12     A. Never heard it.
13     Q. Paragraphs 31, 32, and 33 all focus
14 on Willie Lewis, Brent Ward, and Kyle
15 Kallhoff --
16     A. What -- where are you now? I'm --
17     Q. Sorry.
18     A. -- still on --
19     Q. I'm back on the Complaint.
20     A. Okay.
21     Q. 35. Sorry.
22     A. That's okay. I want to be -- I want
23 to help you here. 31?

Page 67

1      Q. Yes, sir.
2      A. Okay. Go ahead.
3      Q. I'm just generally talking about
4  these three paragraphs 31, 32, and 33.
5      A. Okay.
6      Q. They seem to all focus on Willie
7  Lewis, Brent Ward, and Kyle Kallhoff allegedly
8  harassing and wrongfully disciplining you and
9  the Rigdons. Would you consider that an
10 accurate statement?
11     A. I cannot testify to everything that
12 happened with the Rigdons 'cause I wasn't
13 always with them. But they treated these
14 people very badly, the Rigdons. Having had
15 their child struck and then for them to go
16 through the process of all the things they did
17 to them is -- to me was very sad. As far as
18 for me personally, things definitely changed,
19 Nash, after it happened. And, you know, I
20 almost felt that -- almost felt that they
21 wanted me to lie about what I saw. Brent Ward
22 never denied that he had hit the child -- the
23 kid three times. Stephanie Serra testified

Page 68

1  that they hit him three times. And -- but
2  after that, after all of this took place and
3  after Brent was let go, especially after Brent
4  was let go, it was just a terrible environment.
5  There were -- there were concerns within the
6  community. And I -- I -- I've been coaching
7  and teaching since 1979. I've never been
8  treated like I was treated after that time.
9      Q. What I'm focusing on here is, for
10 instance, allegation in paragraph 31 states:
11 The plaintiffs received random and unnecessary
12 visits in their classroom by Lewis and Ward and
13 were disciplined.
14     And then paragraph 32 states --
15     A. All right. Let's go to 31 then,
16 since you said that. 31.
17     Q. I'm just, for the record --
18     A. Okay.
19     Q. -- saying this involved Lewis and
20 Ward. And then 32, Superintendent Kallhoff was
21 involved, and then Ward and Lewis were
22 involved. And then 33, Ward and then Principal
23 Lewis and Superintendent Kallhoff were

Page 69

1 involved.

2     A. Well, let's start with 31.

3     MR. LOPER: Well, I don't think there's

4 been a question asked.

5     Q. I haven't -- I haven't asked a

6 question yet.

7     A. Okay.

8     Q. Now, it seems that all of these

9 allegations are against Willie Lewis, Brent

10 Ward, and Kyle Kallhoff. Why didn't you sue

11 Willie Lewis, Brent Ward, and Kyle Kallhoff?

12     A. Well, I want to go to 31 there.

13     Q. I'm not asking a question about 31,

14 specifically. I'm asking --

15     A. I -- I --

16     Q. -- you why didn't you sue Willie

17 Lewis, Brent Ward, and Kyle Kallhoff?

18     A. I'm going to answer it if you'll let

19 me, please. Thank you. But on 31, I know the

20 plaintiffs, Rigdons, both Rigdons received many

21 random and unnecessary visits to their

22 classroom by Lewis and Ward. And Brent Ward

23 and Lewis report to the board. The board is --

Page 70

1 is the people that's responsible for running

2 that school as far as oversight, and that's why

3 that's why -- that's why we filed the lawsuit

4 the way we did.

5     And 32, Jamie reported his concern of

6 harassment to Coach -- Mr. Kallhoff. I don't

7 think he got the results that he wanted and so

8 we went to the higher authority. Ultimately,

9 it comes down to the board of education that

10 have to make the final call on things, and

11 that's why we did what we did. That's why we

12 filed the suit the way we did.

13     Q. Okay. But why wouldn't you sue the

14 individuals that were harassing you?

15     A. Because --

16     MR. LOPER: Calls for legal conclusions.

17 You can answer it but it's --

18     A. Just my --

19     MR. LOPER: -- it's a legal --

20     A. -- my --

21     MR. LOPER: -- conclusion.

22     A. -- concern is that -- my concern was

23 this. All I did, I witnessed something. I

Page 71

1 witnessed what I thought was an impropriety.

2 And nobody has disputed that. Nobody has

3 disputed that Brent Ward didn't hit the kid.

4 Everyone knows he did. He, ultimately,

5 resigned from our school. And I felt pressure

6 to not tell the truth about it, to lie about

7 it. I felt pressure to -- to cover it up from

8 the members of the people that are here. But,

9 ultimately, this is a situation of where I felt

10 that -- I mean, basically they didn't care.

11 They didn't care about this kid. They didn't

12 care about his family. And I -- they didn't

13 care about me. So my issue is that we sued the

14 board. We sued the board.

15     Q. Have you ever sued anybody before,

16 Mr. Cottrell?

17     A. I was involved in a lawsuit with the

18 NCAA. I was, yes, sir.

19     Q. And who were the parties in that

20 lawsuit?

21     A. Well, at the beginning of it, it

22 was -- there were multiple parties. There was

23 a radio -- there was a radio network. And then

Page 72

1 the parties involved, it was -- but it was NCA

2 [sic] and -- after my term in Alabama.

3     Q. Did you sue an individual in that?

4     A. We did sue an individual. I think

5 we sued Marie Robbins and Gene Marsh and Tom

6 Culpepper.

7     Q. So you didn't sue the Associated

8 Press, you sued the individuals that --

9     A. No, sir.

10     Q. -- wrote an article against you?

11     A. We sued -- we also sued -- we also

12 sued Paul Finebaum but we sued the network too.

13     Q. I'm sure a lot of people were happy

14 you sued Paul Finebaum.

15     A. Oh, yeah, they were.

16     MR. LOPER: Was that on the record?

17     MR. NASH CAMPBELL: Yeah.

18     THE WITNESS: Don't put that on the

19 record, please; Paul Finebaum.

20     Q. (By Mr. Nash Campbell) Well, Coach,

21 your entire complaint is very specific about

22 targeted allegations involving individuals that

23 were your supervisors yet none of them are

Page 73

1 parties to the suit. That's what I'm asking
2 why. And yet a superintendent was named in
3 this suit who's no longer a party. Why not
4 name the superintendent that caused the grief?
5      A. I'm a high school football coach.
6 I'm not an attorney. But I -- I will state
7 this on the record. I'm upset because in doing
8 my job at the school, I witnessed something I
9 thought was inappropriate. I tried to go
10 through the channels of -- of doing the right
11 thing of reporting it and felt harassed after
12 the fact. I thought law protected, you know,
13 people in those type situations. That's why I
14 got the AEA representative involved. And we're
15 here today because I just really feel like that
16 from the time that happened, everything changed
17 for me in that school system and, ultimately,
18 was terminated. I -- I -- I do believe, now,
19 Nash, I believe if I had just done -- if I'd
20 have just said I didn't see anything, that I
21 probably would still be teaching at Chickasaw
22 High School. I don't think there's any
23 question. I -- I believe that I would still be

Page 74

1 there because it wouldn't have come to this.
2 Now, whether I'm right or wrong, this is what I
3 believe, and that is why I chose to file the
4 suit in the way I did.
5      Q. Do you know any instance when a
6 board member influenced this harassment or
7 disparate treatment?
8      A. I don't. I don't.
9      Q. To your knowledge, did a board
10 member ever tell an employee to harass you for
11 any reason?
12      A. Not to my knowledge, no, sir.
13      Q. To your knowledge, did a board
14 member ever tell an employee to discriminate
15 against you for any reason?
16      A. Not to my knowledge, no, sir.
17      Q. To your knowledge, did a board
18 member ever say that he or she was going to
19 fire you for testifying in the Brent Ward case?
20      A. No, sir.
21      Q. I only have a couple of more
22 questions about the Complaint and then I wanted
23 to move on to some discovery questions. At the

Page 75

1 end of the Complaint you demand placement at
2 your old position along with backpay and some
3 other things. As we discussed, you're
4 currently working at Mobile Christian, correct?
5      A. I am.
6      Q. If you were offered your old head
7 coaching at Chickasaw today, would you work for
8 Chickasaw?
9      A. I would talk to my attorney about
10 it.
11      Q. You knew how little money Chickasaw
12 had when you worked there, didn't you?
13      A. I did.
14      Q. Then do you realize that a judgment
15 in a case like this against Chickasaw would
16 probably cost Chickasaw to lose its program or
17 worse?
18      A. I don't know that. I don't know
19 that, no, sir.
20      Q. Recently -- we can move on from the
21 Complaint, and I'll go ahead and get this to
22 you.
23      MR. NASH CAMPBELL: Obviously, you know

Page 76

1 these well because I think you helped write
2 them.
3      MR. LOPER: Is there a copy for him or
4 is this his copy?
5      MR. NASH CAMPBELL: Yeah, if you don't
6 mind. I've only got two.
7      MR. LOPER: That's fine with me. Yeah.
8      MR. NASH CAMPBELL: I meant to make
9 three --
10      MR. LOPER: That's all right.
11      MR. NASH CAMPBELL: -- but the last
12 minute.
13      MR. LOPER: That's okay.
14      Q. (By Mr. Nash Campbell) I'm marking
15 this as Defendants' Exhibit 90. Coach, I'm not
16 sure if you -- I think you should have
17 recognized this. But it's a Plaintiff Ronald
18 Cottrell's Supplemental Response to Defendants'
19 First Set of Interrogatories and Requests for
20 Production.
21           (Defendants' Exhibit Number 90
22            was marked for identification.
23            A copy is attached.)

Page 77

1    A. I do recognize it.
2    Q. Are you familiar with this document?
3    A. I am.
4    Q. Did you help draft it or --
5    A. I did.  I did.
6    Q. I recently received this
7  supplemental response to our interrogatories
8  and request for production from your attorney.
9  I wanted to just discuss some of these in
10 detail with you.  I won't go through them
11 thoroughly, but there were a handful, but I
12 wanted to look over --
13    A. Nash, I want to help.  Please ask me
14 anything you want.
15    Q. Well, you responded with
16 approximately 35 different people, including
17 yourself, that might have discoverable
18 information in this.  I wanted to clarify a few
19 of them that were a little vague.
20    To clarify, I know now Jean Cottrell is
21 your wife, correct?
22    A. That is correct.
23    Q. You say that she does have personal

Page 78

1  knowledge regarding this case.  Just in general
2  terms, can you tell me what personal knowledge
3  she has about any facts regarding this case?
4    A. She was -- she's a coach's wife.
5  She was there at just about every event, every
6  coaching event.  She attended board meetings.
7  She was a member of the booster club.  She was
8  there.  She also has -- she also has knowledge
9  of the Saturday that Brent Ward and Ricky
10 Ruffin made me come to the -- to the weight
11 room to clean the weight room, and Ward texted
12 me 15 times.  Now, this was after the C▇▇▇▇
13 Rigdon event.  And I had my wife's sister with
14 us, she and her -- he and his -- she and her
15 husband.  And Jean witnessed the way Brent
16 talked to me and raised his voice at me.  This
17 was on Saturday.  There was a volleyball game
18 going on.  And Ricky Ruffin was there.  What's
19 ironic about it, is it's also Ricky Ruffin's
20 responsibility to make sure the weight room is
21 in order.  But she has a very good knowledge of
22 things.  Jean was kind of the person that the
23 whole community contacted after all this

Page 79

1  happened.  She's kind of the team mom.  After
2  C▇▇▇▇ R▇▇▇▇ was hit, parents called and it
3  was -- I mean, the whole community was just in
4  an uproar about the fact that this young man
5  had been hit by the principal.  And --
6  unfortunately, now, I don't think there's a lot
7  of people that like Brent Ward.  I mean -- I
8  mean, there's just not a lot of people that
9  liked Brent.  But he was my boss and I tried to
10 do what he told me to do, even the silly things
11 that he made us do.  So I -- we came up that
12 day and we cleaned that weight room.  And --
13 but she has a lot of knowledge.  You definitely
14 should talk to her.  You definitely should
15 visit with her, for sure.
16    Q. Was she at most of your football
17 games?
18    A. She was at every one.
19    Q. So she would have witnessed a lot of
20 things involving your supervisors?
21    A. No doubt.
22    Q. Okay.  Anything involving any board
23 members that she would have witnessed?

Page 80

1    A. Probably.  Probably she would.
2    Q. Did she ever personally talk to
3  board members when you weren't around?
4    A. I don't know.  I don't know.
5    Q. Page 13, letter C.  I think it
6  states, more or less, that there's a meeting
7  between you and I believe it was then acting
8  Principal Lewis.
9    A. Yes, sir.
10    Q. And that Lewis brought you into his
11 office to discuss lesson plans?
12    A. He did.
13    Q. And that you explained that three
14 science teachers shared lesson plans and that
15 Lewis was aware, that he'd been instructed to
16 do so by Ward.  Can you tell me about what time
17 of year this was?
18    A. It was after -- it was -- it was
19 after the -- it was after Brent Ward had struck
20 him and I guess Brent was gone.  So it had to
21 be -- had to be before Christmas, but sometime
22 in that area.  We had just had a board
23 meeting -- not a board meeting.  We had just

Page 81

1 had a faculty meeting, and Mr. Lewis had gone
2 through a typical situation where he goes
3 through, you know, what's happening in the
4 school, what's the next things are going. And
5 then at the end, he said -- he pointed at Jamie
6 Rigdon, he said, Hey, I need to see you right
7 now, I need to see you. And he had already
8 spoken to me earlier that he wanted to meet
9 with me after the board meeting and -- I mean
10 after the faculty meeting.
11      And so we followed him to his office.
12 His office was still in the back. He had not
13 moved into Brent Ward's office yet. And it's a
14 small office. He met with Jamie first, and I
15 stood outside the door. He closed the door.
16 There's a glass window in between. And he
17 begins to yell at Jamie Rigdon. I'm talking
18 about at the top of his lungs. I couldn't
19 understand what he was saying but he was
20 yelling at him. And I want to describe that
21 Jamie was sitting in a chair. Jamie's sitting
22 in a chair and Mr. Lewis is standing over him.
23 If I could use you as a -- and he was in a low

Page 82

1 chair and his mid section was, like, right in
2 his face. And he's yelling at him (indicating)
3 and just pointing at him and -- and I don't --
4 and it was just -- it was just a terrible
5 situation. After probably five or ten minutes,
6 he gets up and he -- as they walk out, he's
7 still yelling. He's -- and Mr. Lewis is
8 yelling, Thank you very much; thank you, sir;
9 thank you very much. And I don't even know --
10 I don't even know what all it was about. I
11 have no clue. It was supposed to be about
12 lesson plans.
13      So he brought me in and -- and he -- the
14 first thing he said to me, he said, Your boy's
15 got an attitude; your boy's got an attitude.
16 And -- but I need to talk to you about your
17 lesson plans.
18      Now, you said Mr. Ward -- Mr. Ward had
19 set that up but Mr. Lewis had also told me to
20 do lesson plans together. Ms. Serra and also
21 Ms. Seaman and I did lesson plans together. I
22 taught one biology class. And what he wanted
23 was for all of us to be on the same level or

Page 83

1 same place in the book, Nash. So what we were
2 doing, we would all -- we would get together
3 and we would do lesson plans. So, basically,
4 we all three had the same. And -- but what he
5 wanted from me was to begin to do my -- do the
6 same thing but put my own name on it and send
7 it to him, which I did. He -- he was always
8 very -- let me go back. I should not have said
9 "always." Strike that.
10      After what happened and after he became
11 in charge, he was always very belligerent to
12 me. He was always almost rude to me. And he
13 was there as well in that how he would talk and
14 point his finger at -- I mean, I just had --
15 I've never been talked to the way he talks to
16 me.
17      But we left there. Everything was fine.
18 And I complied. I did what he asked me to do.
19 But it was just very odd that there were only
20 two of us he called -- he brought out of that
21 meeting. And there were numerous people.
22 He -- in fact, he told me there were numerous
23 people that had not turned in lesson plans on

Page 84

1 time, but he only spoke to Jamie and I. We
2 were the only two he called out at that faculty
3 meeting. And the -- quite frankly, the
4 situation with him and Jamie Rigdon was ugly.
5 It was a -- it was a very ugly deal and . . .
6      Q. Well, I caught something in there
7 that I found interesting and I wanted to make
8 sure that -- if this was accurate. Said that
9 Lewis was aware that he had been instructed to
10 do so by Ward. Is that accurate, that Lewis
11 said that he had been told to do something by
12 Ward after Ward was no longer on campus?
13      A. No. No, that's not what I meant.
14 That's not what that meant by that. What was
15 meant by that statement is in the beginning of
16 the school year, Mr. Ward was the principal.
17 He was the principal and he instructed us -- in
18 fact, Mr. Ward and Will Lewis both had specific
19 ways that they wanted things done and they
20 would tell you the way they wanted it. Brent
21 Ward had told us this is how he wanted the
22 lesson plans to be done. And what I said was
23 you -- after Brent Ward left, Mr. Lewis told us

Page 85

1 to continue.  But just -- just a few days
2 after -- let me go back.  I'm sorry.
3        He had told me to continue doing what we
4 were doing.  But in about seven or eight days
5 later, he came back and said, I want you to do
6 it this way, which we complied.  I don't know
7 if he had talked to Brent Ward or not.  I don't
8 know if he did.  I would not be surprised if he
9 continued to talk to Brent Ward.
10       Q.  Your statement also says that other
11 science teachers were not questioned about any
12 of this.  How do you know none of the other
13 science teachers were questioned about it?
14       A.  Because I asked them.  I asked them.
15 I mean, we still met together, Nash.  We still
16 took -- we still met together and -- I -- I
17 spent more time with Ms. Seaman.  Ms. Seaman
18 and I were closer friends.  I love Ms. Serra
19 but she was pretty busy so usually Ms. Seaman
20 and I would work together as far as sharing
21 stuff.  Her -- her room was right across from
22 my classroom.  Ms. Seaman -- Ms. Serra was in
23 the other end of the hall.

Page 86

1        Q.  Will you look at page 15, letter P?
2        A.  Yes, sir, I see it.
3        Q.  I believe it say states that on or
4 about October 28th, 2014, during third period,
5 Ruffin called Cottrell to a meeting with Ward.
6 Ward yelled at Cottrell, quote, I am not going
7 anywhere, end quote, and threatened him, quote,
8 If my name comes out of anybody's mouth, end
9 quote, period.  Ruffin witnessed this and
10 smiled and nodded as Ward yelled at Cottrell,
11 period.  Ward told him that he was going to,
12 quote, Get all of his guys, period, end quote.
13       Can you tell me about that?
14       A.  It's just exactly what he said.  He
15 brought me in on the 28th and he yelled at me
16 and said that he wasn't going anywhere.  And he
17 said that, You tell -- his exact words, You --
18 said, You tell your coaches, you tell your
19 assistant coaches that if my name comes out of
20 anybody's mouth that they were going to be
21 fired, they would be let go.  And he kept
22 pointing his finger at me.  I don't know why
23 Ruffin was in there because it really --

Page 87

1 everything we talked about had nothing to do
2 with him.  But it was, like, he was nodding and
3 smiling and that -- Ruffin never said anything
4 during that meeting.  But I had given a
5 statement the day before.  I had given a
6 written statement the day before about him
7 hitting C██████   I think it was the day
8 before or sometime at that point.  I just
9 remember what made him angry was that I had
10 done a written statement but so had Ruffin, and
11 I just did what I was asked.  I just did what I
12 was asked to do.
13       Q.  Do you -- so Ward called this
14 meeting?
15       A.  He did.
16       Q.  Who all was in the meeting?
17       A.  Only remember me and Ruffin -- and
18 me and Ruffin and him.
19       Q.  So just three of you?
20       A.  That's all I remember.
21       Q.  And it was definitely on October
22 28th?
23       A.  I -- that's what -- that's what I

Page 88

1 remember.  Yes.  I think it was -- I don't
2 remember what day that I gave the written
3 statement but it was either the day before that
4 or maybe a day or two before.  At this point,
5 Mr. Ward is -- he's out of his mind now.  I'm
6 talking about he is, like, on a war path.  He's
7 yelling at all of us.  He's yelling at
8 teachers.  And -- I don't know when the sexual
9 harassment complaint became -- but it -- when
10 it became involved in that.  But, I mean, it
11 was just going haywire and -- for him.  And he
12 was -- I mean, he was -- it was something else.
13 I mean, he was yelling at the top of his lung.
14 And he's -- he's -- he's not a guy, I think,
15 that -- that you want mad at you, yelling at
16 you, because he's had a very -- very quick
17 trigger.
18       Q.  Letter Q, right below the one that
19 we were just discussing, it says that Ward
20 supposedly cornered a teacher who filed a
21 complaint for sexual harassment against him.
22       Do you know who that teacher was?
23       A.  Yes.  Kasey Sours (phonetic).

Page 89

1      Q. Do you know how to spell that?
2      A. She's listed as one of the
3  witnesses, if you'll flip back.
4      Q. Saucer? S-A- --
5      A. Saucer. It is --
6      Q. -- -U- --
7      A. -- Saucer.
8      Q. -- -C- --
9      A. Yeah. It's --
10     Q. -- -E-R?
11     A. -- not Sours. Saucer. I'm sorry.
12     Q. Do you know when that happened?
13     A. No, sir. I don't know the day. But
14  I did -- I was at my truck when -- I'd gone to
15  get something out of my truck when -- I think
16  it was -- I can't remember her name. The
17  principal of the elementary school. Mrs. --
18  anyway, the elementary school principal walked
19  out and got Ms. Saucer off of the -- off the
20  P field and brought her in to Mr. Ward's
21  office. Now, I think Kasey thought that she
22  was bringing him in -- she was bringing her in
23  to talk to her but she actually brought her in

Page 90

1  to an office where Brent could talk to her.
2  And she had written a statement, I think, to
3  the superintendent about the alleged sexual
4  Harassment with Brent Ward. And when I talked
5  to her later, she shared with me what they did
6  to her as far as putting her -- sitting her in
7  a corner and she couldn't even get out. Brent
8  standing over there raising his voice at her.
9  I don't know who the other person was that was
10  with the elementary principal but they -- Kasey
11  felt like they trapped her. They ambushed her.
12     Q. So Kasey said there was a witness in
13  the office?
14     A. Well, whoever the elementary
15  principal was carried her in there. I don't
16  know if there was a witness or not. I don't
17  know. But she just said she felt like that
18  they brought her in to be ambushed by Brent
19  Ward.
20     Q. After reading through the majority
21  of your statements from page 13 through 15 in
22  your discovery, it seems like a lot of these
23  are mainly about James Rigdon, not about you.

Page 91

1  Would that be an accurate statement?
2      A. Well, I don't want to say something
3  that's incorrect, but I'll be glad to talk
4  about anything that's mine. I -- I really
5  think that you should ask Jamie if those are
6  mostly about him. You should ask him. I'll be
7  here as long as you want me to be and answer
8  anything you want because I want to cooperate.
9      Q. Well, for instance, letter A on page
10  13, would it be accurate to say that's about --
11  that's referring to Jamie Rigdon, not you?
12     A. Letter A?
13     Q. Yes, sir.
14         (Pause while witness reviews
15             document.)
16     A. Yes. Yes, it was.
17     Q. And then letter B?
18     A. Yes, it was.
19     Q. And letter D?
20     A. Well, let me say letter B --
21  letter -- letter B, that was the lesson plan
22  thing and I did witness that and I witnessed
23  him -- Willie Lewis yelling at Jamie as he

Page 92

1  walked down the hall. You said letter C?
2      Q. D.
3      A. I don't -- I don't know about that.
4      Q. Well, I'm just --
5      A. But -- but --
6      Q. -- referring --
7      A. -- let me say this about letter D.
8  Plaintiff Rigdon was written up by Lewis for
9  something he had -- see, this is part of the
10  reason that I filed this Complaint to begin
11  with, Nash. A lot of stuff that they did to
12  Jamie and me, like they wrote me up for a
13  financial -- they said that I did not follow
14  financial procedures of something I did in
15  August. They waited until second semester,
16  December of -- December of second semester
17  to -- to do something about it. And it just
18  coincidentally was after all of this took
19  place, specifically after Ward was let go.
20  There's only -- there's really only one
21  situation that -- on here that I want to be
22  specific on, is letter G, because this is about
23  me. And I was written up by Willie Lewis for

Page 93

1  having college recruiters on campus.  And he
2  wrote it up that I had unacceptable and
3  unprofessional behavior for pulling students
4  out of class to meet with recruiters who were
5  offering scholarships.  I was disciplined for
6  it.  And see Ryan Smith, who is now at the
7  University of Florida, he's the one that
8  handled that whole situation to the visit.  I
9  mean, it was -- if you go back and you look at
10  the -- if you go back and look at the testimony
11  of -- and the e-mails that we got from the
12  people involved, I mean, Ryan Smith did the
13  whole thing.  But after the fact, they write it
14  up for it to be me.  For it be me.  So that's
15  why I listed that one on there.  And, you know,
16  we talked about the -- you know, all of these
17  things are listed.  And it seemed like every
18  day, you know, it's just like a haunting deal.
19  It just haunts me the whole -- the whole -- the
20  way the situation was.
21        Q.  Since you mentioned letter G, did
22  any of your players actually get scholarships
23  at Chickasaw?

Page 94

1        A.  Yes, sir, they did.
2        Q.  Did they get to attend the college?
3        A.  Unfortunately -- unfortunately,
4  Keivonte Gallmon did not.  They sent him to a
5  prep school.  C████ r R████ did.  He went
6  to -- he's gone to multiple schools.  We had
7  another young man that went to -- to Faulkner.
8  We had several guys that signed on signing day.
9        Q.  Who went to Faulkner?
10        A.  I cannot remember his name, a little
11  defensive back.  I'll get my attorney to get it
12  for you, get his name.
13        Q.  When looking at all the instances
14  that you have listed on page 13 through 15 --
15        A.  Yes, sir.
16        Q.  -- do any of these incidences you
17  have mentioned in your discovery involve board
18  members harassing you personally?
19            (Pause while witness reviews
20             document.)
21        A.  No, sir, not that I can see.  I'm
22  looking through quickly.
23            (Pause while witness reviews

Page 95

1            document.)
2        A.  The only thing involving the board
3  would be letter Y.  At the end of the football
4  season, we organize and use personal funds to
5  pay for a banquet for the football team.  We
6  also invited the volleyball team.  And then
7  Kyle criticized me and disciplined me for
8  inviting the board members to -- I say
9  discipline, but just chastised me for not
10  inviting the board members to come, but I had.
11  I had called and invited them all.  But I think
12  to answer the question, I don't know -- I don't
13  remember any board member saying anything about
14  these situations.
15        Q.  Do you think any of your behaviors
16  while employed at Chickasaw warranted
17  discipline?
18        A.  Not the ones they wrote me up for.
19  And no, I really -- I really don't.  I think I
20  did a good job for them there.  I think I did a
21  good job.
22        Q.  So anything you did wrong as a
23  teacher or employee at Chickasaw?

Page 96

1        A.  Well, I didn't say I was perfect.  I
2  pray every morning for God to forgive me of the
3  sins that I do.  But I really don't.  I think
4  what happened is, is that nothing -- before
5  C████ R████ was struck, nothing that we did
6  at the beginning of that situation was, like,
7  made -- made into a situation that it be- --
8  was any -- even a problem.  I mean, it was --
9  it was a good -- it's a great little school.
10  It's a tremendous community.  But after
11  C████ R████ was hit and after all the --
12  the wake of all of that event, it was just a
13  different environment in which, I mean -- I
14  mean, you've seen my personnel file, Nash.  You
15  know what's in there.  But no, I -- I don't
16  think -- I don't think that I did anything
17  that -- I don't think that I did anything that
18  was not -- an administrator wouldn't have
19  worked with me on that would have -- to make me
20  a better teacher or a better coach, that they
21  wouldn't have worked with me on instead of
22  trying to -- to just make me look bad.
23        Q.  Do you think any of James Rigdon's

Page 97

1  behavior while acting as an employee at
2  Chickasaw warranted discipline from his
3  supervisors?
4       A.  I didn't witness anything, but you'd
5  have to ask Jamie.  You'd have to ask him.
6  Jamie did a good job coaching baseball.  He did
7  a good job for me coaching football.  I don't
8  really remember observing him teaching, and
9  it's not my job to evaluate him teaching.  I
10  mean, he was a member of that community.  He
11  lived there.  I think you just need to ask him,
12  Nash.  He can probably help you with that one.
13       Q.  What could you have done better as a
14  teacher at Chickasaw?
15       A.  I think I did a good job teaching
16  biology.  I was proud of that situation.  I
17  worked with two really special teachers.
18  Ms. Seaman, she's phenomenal.  The -- the
19  teaching part, I mean, I did what I was
20  supposed to as far as I did the job for them.
21  The P.E. classes we had, I taught my class.
22  I -- I never missed a class.  I supervised my
23  class.  When I came there to -- when I was

Page 98

1  hired as coach, Mr. Ruffin and -- not
2  Mr. Ruffin, Mr. Ward told me I would be
3  teaching P.E.  But after the fact -- because I
4  am certified and highly qualified in science,
5  they asked me to teach one science class and do
6  the intervention because it meant so much more
7  money for the school and so I did it.  I mean,
8  I'm a veteran football coach.  I've coached a
9  long time.  I mean, at this point in my career,
10  I probably should have taught P.E.  But I did a
11  good job for them, Nash.
12       (Discussion between Mr. Nash
13        Campbell and Mr. Bob Campbell
14        out of the hearing of the court
15        reporter.)
16       MR. BOB CAMPBELL:  Take a break.
17       (Brief recess)
18       MR. NASH CAMPBELL:  Tom, we're done if
19  you don't have anything.
20       MR. LOPER:  I'm good.
21       MR. NASH CAMPBELL:  Nothing?  All right.
22       * * * * * * * * * * *
23       FURTHER DEPONENT SAITH NOT

Page 99

1       REPORTER'S CERTIFICATE
2  STATE OF ALABAMA:
3  COUNTY OF BALDWIN:
4       I hereby certify that the above
5  proceedings were taken down by me and
6  transcribed by me using computer-aided
7  transcription and that the above, to the best
8  of my ability, is a true and correct transcript
9  of said proceedings taken down by me and
10  transcribed by me.
11       I further certify that I am neither of kin
12  nor of counsel to any of the parties nor in
13  anywise financially interested in the outcome
14  of the case.
15       I further certify that I am duly licensed
16  by the Alabama Board of Court Reporting as a
17  certified Court Reporter as evidenced by the
18  ACCR number following my name found below.
19
20       /s/ Audrey Kirkland
21       Audrey Kirkland
22       ACCR #163
23