# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**RONALD COTTRELL**, *et al.*,    )
                                   )
      Plaintiff,    )
                                   )
vs.    )    **CIVIL ACTION NO. 16-0503-CG-N**
                                   )
**CHICKASAW CITY SCHOOLS**    )
**BOARD OF EDUCATION**,    )
                                   )
      Defendant.    )

## MEMORANDUM OPINION AND ORDER

This lawsuit is the result of Plaintiffs' employment being terminated by Defendant. Specifically before the court is Defendant, Chickasaw City Board of Education's (the "Board"), Motion for Summary Judgment (Doc. 40) and brief in support thereof (Doc. 41), Plaintiffs' Response in opposition (Doc. 44) with materials in support (Doc. 43), and Defendant's Reply (Doc. 45). For the reasons explained below, the Court finds that Defendant's motion for summary judgment should be granted.

## FACTS

Plaintiffs, Ronald Cottrell ("Cottrell"), James Rigdon ("J. Rigdon"), and Stacey Rigdon ("S. Rigdon") were each employees of the Chickasaw City School System for the 2014-15 school year. (Doc. 1 at 2.) Cottrell and J. Rigdon were both employed as teachers and coaches while S. Rigdon was employed as a paraprofessional. (*Id.*) J. Rigdon and S. Rigdon are also husband and wife and

1

their son, Chandler Rigdon was a senior student at Chickasaw City School during the 2014-15 school year. (*Id.*)  On September 21, 2014[1], Chandler Rigdon was involved in an incident (the "incident") wherein the principal of Chickasaw City High School, Brent Ward, struck him on the head/neck between one and three times in front of three other teachers, Stephanie Serra ("Serra"), Ricky Ruffin ("Ruffin"), and Ronald Cottrell.  (*Id.* at 3).   Brent Ward ultimately resigned from his position based on another incident unrelated to this lawsuit.  However, the facts surrounding the investigation of Mr. Ward's behavior are disputed by the parties and are pertinent to this motion.

Plaintiffs assert that following the incident with Chandler Rigdon and Principal Ward, Ruffin took Chandler outside of the school building and instructed him not to tell his father, J. Rigdon, what had occurred.  Ruffin then approached J. Rigdon in his classroom and informed him of the incident and told him that he, Ruffin, had taken care of it.  (*Id.* at 3).  At the end of the school day Serra informed the Rigdons of the incident and apologized that it had occurred. (*Id.*) Cottrell was approached by the assistant principal, Willie Lewis "(Lewis") after the school day ended and told that he needed to calm J. Rigdon down and that the Rigdons did not need to press charges. Cottrell replied that Ward should not have hit a student. (*Id.*) The same afternoon, after football practice, Lewis approached J. Rigdon and stated

---

[1] Defendant disputes the date Plaintiffs contend this incident occurred and assert the correct date is between August 18 and 22, 2014. (Doc. 41 at 3; Doc. 41-15). However, the exact date of the incident is not material to the issues addressed herein below.

"Word for the wise, if you want to stay, you need to let it go." (*Id*. at 4). The day after the incident, Cottrell met with Ward and suggested that Ward apologize for the incident, to which he refused. (*Id*.) Days after the incident occurred, J. Rigdon requested video surveillance of the incident and that video was provided to him in Ward's office where J. Rigdon, Ruffin, and Ward watched the video. (*Id*.)

Following the incident, Cottrell and J. Rigdon reported the incident to Robert McFall ("McFall"), president of the Chickasaw School Board of Education and Kyle Kallhoff ("Kallhoff"), the superintendent. (*Id*.) Kallhoff instructed J. Rigdon to report the incident to Ward in accordance with the school's chain of command.[2] (*Id*.) Kallhoff also called Cottrell to determine the veracity of the incident and Cottrell confirmed that he witnessed the incident occur. (*Id*.) Kallhoff responded that he was not going to investigate because Ward was doing a good job. (*Id*.) S. Rigdon then reported the incident to the Superintendent of the Alabama State Department of Education and a week later, Kallhoff requested a meeting with Mr. and Mrs. Rigdon which occurred in the presence of the attorneys for the Board and the school system. (*Id*.) Plaintiffs contend that following the meeting, no investigation was initiated. (*Id*.)

The remaining events relevant to this action are listed below in chronological

---

[2] It is unclear whether J. Rigdon actually spoke with Kallhoff before being told to follow the proper chain of command relating to the reporting of the incident. Rather, the Complaint indicates J. Rigdon "called" Kallhoff (not "spoke with") (Doc. 1 at 4.) and Plaintiff's Response indicates "Kallhoff's office" – not Kallhoff- "instructed James Rigdon to talk to the Principal, Brent Ward (Doc. 44 at 9).

order:

On September 25, 2014, Lewis sent J. Rigdon an email regarding problems observed in his classroom and J. Rigdon responded the same day. (Doc. 41-17 at 12-13). J. Rigdon's response brings up the incident.

On October 8, 2014, a co-employee sent an email to Lewis and Ward regarding J. Rigdon's behavior relating to his son receiving a uniform violation. J. Rigdon responded to that email and brought up the incident. (*Id*. at 14-15).

On October 27, 2014, Cottrell completed a witness statement relating to the incident. (*Id*. at 60).

On October 27, 2014, Ward was reprimanded for the incident involving Chandler. (Doc. 41-17 at 36).

On October 29, 2014, as a result of another incident, Ward was placed on administrative leave. (*Id*. at 58). Lewis was named interim principal upon Ward's exit. (Doc. 1 at 5). Shortly thereafter, Ward resigned in response to the other unrelated incident. (*Id*.)

On October 31, 2014, interim principal Lewis observed J. Rigdon's classroom to be disorderly and questioned him about the state of the class. (Doc. 41-17 at 16).

On November 3, 2014, Lewis issued a written reprimand to J. Rigdon for his behavior during their previous encounter on October 31, 2014. (Doc. 41 at 6; Doc. 41-17 at 16).

On November 3, 2014, Chandler Rigdon filed a police report with the

Chickasaw Police Department against Brent Ward for the incident. Ward was charged with harassment and prosecuted in Chickasaw Municipal Court. (Doc. 41 at 5).

The Board accepted Ward's resignation on November 13, 2014. (Doc. 41 at 4).

On December 19, 2014, Lewis wrote a letter to J. Rigdon regarding a conflict of interest for conducting personal business with school. (Doc. 41-17 at 17).

On December 20, 2014, Lewis wrote a letter to J. Rigdon regarding a personal conflict involving a student that was negatively impacting positive work environment. (*Id*. at 20).

On December 22, 2014, S. Rigdon sent an email to Lewis requesting that he stop harassing her and her family. (*Id*. at 26-27).

On February 26, 2015, Cottrell was reprimanded by Kathy Odom for meeting with recruiters during instructional time. (*Id*. at 3).

On March 10, 2015, Cottrell was given a letter from Lewis explaining items that needed Cottrell's attention (relating to sports). (*Id*. at 4).

On March 18, Cottrell was reprimanded for making purchases without following proper accounting procedures. (*Id*. at 5).

On March 18, 2015, S. Rigdon sent an email to Lewis that mentions the incident. (*Id*. at 28-29).

On April 21, 2015, Cottrell was given Letter of Reprimand for unprofessional

conduct and insubordination.  (*Id*. at 8-9).

On May 6, 2015, S. Rigdon sent an email to Lewis that again demanded that Lewis stop harassing her and her family.  (*Id*. at 31)

On May 6, 2015, James and Stacey Rigdon were placed on administrative leave.  (*Id*. at 68).

On June 11, 2015[3], Kallhoff recommended that each of the Plaintiffs be non-renewed and the Board approved the recommendations resulting in the termination of Plaintiffs.  (Doc. 1 at 6).

 On August 4, 2015, Cottrell testified in Municipal Court resulting in Ward being found guilty, a result that Ward appealed to Circuit Court.  (Doc. 41-11 at 10-11).

On January 11, 2016, Cottrell testified in Circuit Court resulting in Ward being found not guilty.  (*Id*. at 11).

## DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The trial court's

---

[3] Defendants dispute the date the recommendation was made and contend the correct date was May 21, 2015.  (Doc. 41 at 2-3; Doc. 41-17 at 50-57).   The exact date is immaterial to the issues addresses herein below.

function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson*, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson*, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838,

841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." *Vega v. Invsco Group, Ltd.*, 2011 WL 2533755, *2 (11th Cir. 2011). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

### B.    Count One: SEPA Claim

Defendant asserts that summary judgment is due to be granted as to Count One of the Complaint stating a cause of action pursuant to the State Employees Protection Act because Plaintiffs were not state employees. (Doc. 41 at 11). In response, Plaintiffs stated: "Defendant is entitled to summary judgment on Plaintiffs' Count One State Employees Protection Act Claim. Plaintiffs hereby concede and withdraw their claim contained in Count One of their Complaint with regards to the State Employees Protection Act." (Doc. 44 at 5). As such, summary judgment is granted as to Count One.

### C.    Count Two: Violation of First Amendment Right to Freedom of Speech

Plaintiffs contend that the Board and the Superintendent retaliated against them in that

> they terminated their employment for participating and testifying in the criminal prosecution of another school employee. Alternatively, and/or additionally, Plaintiffs James Rigdon and Stacey Rigdon were terminated due to their association with their son and their son's filing of charges against another employee of the Board. Further, for the same reasons, Plaintiffs were retaliated against by being treated differently, by being observed more strenuously, and by losing the support of the Board and the Superintendent in their coaching of System's athletic teams.

(Doc. 1 at 7-8).

In support of their position, Plaintiffs have pointed to a number of encounters between themselves and other school administrators, mainly Lewis and Kallhoff, which occurred either following the incident or following Chandler's filing of a police

report.  Defendant contends that Plaintiffs' First Amendment claims are due to be denied as a matter of law because their actions did not constitute free speech.  (Doc. 41 at 14).  More specifically, Defendant argues that Plaintiffs' statements relating to the Ward incident were made in their official capacities and were not on a matter of public concern, such that the statements and actions of Plaintiffs are not protected.  (*Id.* at 13-23).

Although the law is well-established that the state may not demote or discharge a public employee in retaliation for speech protected under the First Amendment, a public employee's right to freedom of speech is not absolute. *Bryson v. City of Waycross*, 888 F.2d. 1562, 1565 (11th Cir. 2017) citing *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Rather, the First Amendment protection of a public employee's speech depends on a careful balance "between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Ed. of Township High School Dist.* 205, Will Cty., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).  To strike this balance, courts employ a four-factor analysis in assessing First Amendment retaliation claims. *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617 (11th Cir. 2015).

> At the first stage, the court determines the threshold issue raised in *Pickering*, whether the employee's speech may be "fairly characterized as constituting speech on a matter of public concern." *Rankin*, 483 U.S. at 384, 107 S.Ct. at 2896–97 (quoting *Connick v.*

> *Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983)).
> The court examines the content, form, and context of the employee's
> speech to determine whether it addresses a matter of public concern.
> *Rankin*, 483 U.S. at 384–85, 107 S.Ct. at 2897. Second, if the speech
> addresses a matter of public concern, the court then applies the second
> prong of *Pickering*, the balancing test, weighing the employee's first
> amendment interests against "the interest of the state, as an employer,
> in promoting the efficiency of the public services it performs through
> its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. Again, the
> context and circumstances of the employee's speech must be
> considered. *Rankin*, 483 U.S. at 388, 107 S.Ct. 2898. If the public
> employee prevails on the balancing test, the fact-finder determines
> whether the employee's speech played a "substantial part" in the
> government's decision to demote or discharge the employee. *Mt.
> Healthy City School District Board of Education v. Doyle*, 429 U.S. 274,
> 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Fourth, if the employee prevails
> by showing that the speech was a substantial motivating factor in the
> state's employment decision, the state must prove by a preponderance
> of the evidence that "it would have reached the same decision ... even
> in the absence of the protected conduct." *Mt. Healthy*, 429 U.S. at 286,
> 97 S.Ct. at 576. This fourth stage has been referred to as a "but for"
> test; the employer must show that "its legitimate reason, standing
> alone, would have induced it to make the same decision." *Price
> Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 1791, 104
> L.Ed.2d 268 (1989).

*Bryson*, 888 F.2d. at 1565. The first two elements are questions of law designed to

determine whether the First Amendment protects the employee's speech. The third

element and affirmative defense are questions of fact designed to determine

whether the adverse employment action was in retaliation for the protected speech.

*Battle v. Board of Regents for Georgia*, 468 F.3d 755, 760 (11th Cir. 2006) (citation

omitted).

   This Court will analyze each of the first two *Pickering* factors with regard to

the allegedly protected statements of the Rigdons and Cottrell separately.

11

### 1) Ronald Cottrell

Cottrell contends that the facts, taken in a light most favorable to him, show that he witnessed Ward assault Chandler, that he thought Ward's behavior was inappropriate, and that he spoke out about the incident by way of an investigatory statement, a verbal report to the President of the School Board, and testimony in Court. (Doc. 44 at 20). Defendant concedes and there is no legal debate that Cottrell's court testimony is speech as a citizen on a matter of public concern. (See *Lane v. Franks*, ―― U.S. ――, 134 S.Ct. 2369, 2379, 189 L.Ed.2d 312 (2014); Doc. 41 at 22*).* Whether Cottrell's pre-testimony speech is protected, however, is disputed among the parties and requires analysis. As to those statements, Defendant argues that Cottrell was speaking in his official capacity and not as a citizen on an issue of public concern. Plaintiffs argue that Defendant's characterization of Cottrell's statements as being made in his official capacity are misguided and, therefore, they assert that Cottrell's speech is protected by the First Amendment. (Doc. 44 at 20-21).

In order to determine whether Cottrell's speech is protected, this Court must discern the purpose of the Cottrell's speech—that is, whether [he] spoke on behalf of the public as a citizen, or whether the employee spoke for [him]self as an employee. *Connick*, 461 U.S. at 146. The Supreme Court, in *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), declined to provide a "comprehensive

framework" for deciding this question, but did provide some general guidance.[4] The Court defined speech made pursuant to an employee's job duties as "speech that owes its existence to a public employee's professional responsibilities," *id.* at 421, 126 S.Ct. at 1960, and a product that "the employer itself has commissioned or created," *id.* at 422, 126 S.Ct. at 1960. Factors such as the employee's job description, whether the speech occurred at the workplace, and whether the speech concerns the subject matter of the employee's job may be relevant, but are not dispositive. *Id.* at 420–21, 424, 126 S.Ct. 1951. *Garcetti* instructed that "[t]he proper inquiry is a practical one." *Id.* at 424, 126 S.Ct. 1951.

> To fall within the realm of the "public concern," an employee's speech must "relat[e] to a[ ] matter of political, social, or other concern to the community." *Connick v. Meyers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). To determine whether speech is a matter of public concern, a court considers "the content, form and context of a given statement, as revealed by the whole record." *Deremo v. Watkins*, 939 F.2d 908, 910 (11th Cir.1991) (citing *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690). A court may consider the employee's attempts to make the concerns public, along with "the employee's motivation in speaking." *Id.* at 911 (citations omitted). " '[T]he mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment.' " *Kurtz*, 855 F.2d at 727 (quoting *Terrell v. University of Tex. Sys. Police*, 792 F.2d 1360, 1362 (5th Cir.1986), cert. denied, 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987)). Rather, it must be determined whether the purpose of the speech was to raise issues of public concern, on the one hand, or to further private interest, on the other. *See Deremo*, 939 F.2d at 912 (employees' request for compensation for remaining silent about sexual harassment did not constitute a matter of public concern).

*Morgan v. Ford*, 6 f.3d 750, 754 (11th Cir. 1993).

---

[4] Unlike in this action, the plaintiff in *Garcetti* admitted that he spoke pursuant to his official duties. *Garcetti*, 547 U.S. at 424, 126 S.Ct. 1951.

The total content of the written statement dated October 27, 2014, given to Kallhoff, states as follows: "Brent Ward hit Chandler Rigdon three times[.] First on top of his head, second in the back of his head and third on his cheek with his forearm." (Doc. 41-17 at 60). The content of the written statement offers some insight as to its purpose because it describes Cottrell's observation of a specific incident and does not mention any other opinions or concerns. It was also given to Kallhoff privately and Cottrell made no attempt to bring it to the attention of the public. The date of the written statement also offers some insight as it was provided approximately two months after the incident occurred, an amount of time that does not support a desire to bring the event to the attention of the general public out of concern for Ward's misconduct. Lastly, it is undisputed that Cottrell provided the written statement to Kallhoff, his superior, *upon his request* and it was not written by Cottrell on his own initiative. (Doc. 43-12). Considering the content, form, and context of the written statement it is clear that the same was made as part of Cottrell's official duties as part of an investigation of a private matter by the school's administration that Cottrell's statement was not made as a citizen on a matter of public concern. As such Cottrell's written statement is not protected.

With regard to his verbal reporting of the incident to Kallhoff, McFall, and Ham, Cottrell has not provided any facts to establish that the speech was by a citizen on a matter of public concern. The only facts provided by Cottrell relate to his meeting with McFall. In that regard, the record indicates that Cottrell drove to

14

McFall's house at some point after the incident occurred and only after Cottrell was unable to speak with Kallhoff and that Cottrell spoke with McFall about the incident in McFall's kitchen. (Doc. 43-1 at 46-49). While at McFall's house, Cottrell "told him what happened." (*Id*. at 48). The only stated reason for Cottrell's conversation with McFall was because he had previously been unable to talk with Kallhoff, he didn't want to talk to Ward since the incident involved him, and because Cottrell respected McFall. (*Id*. at 46-49). As such, the record reflects that Cottrell sought to have a private conversation with the single member of the Board whom he most respected about the subject incident that he witnessed. Cottrell has not presented any facts that his conversation with McFall was initiated in his capacity as a private citizen in an attempt to discuss a matter of public concern versus in his capacity as a teacher to a person up the hierarchal chain of command.

The timing, circumstance, content, or arena in which the statements with Kallhoff and Ham were made is not a part of the record. As such, it cannot be determined whether Cottrell was speaking as either an employee or a citizen. Plaintiffs argue that Defendants have not established that Cottrell was acting in accordance with his official duties because they have not provided any job description showing his job duties; however, such a standard is not required. *See Garcetti* at 425 ("[T]he listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment

purposes."). Rather, the initial burden is upon *Plaintiff* to establish that he engaged in protected speech and for purposes of summary judgment, Defendant need only establish that Plaintiffs have not met that burden or that the facts taken in a light most favorable to Cottrell could in no way result in a jury finding that Cottrell was speaking as a citizen on a matter of public concern. *See Howard*, 32 F.3d at 524 (Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial").

In effort to establish that he engaged in protected speech, Cottrell, in response to the subject motion for summary judgment, submitted an affidavit which stated, "I reported Brent Ward hitting Chandler Rigdon because, I like any other member of the community, know that it is wrong for an adult to hit a student." (Doc. 43-12 at 3). Even assuming his statements were made as a citizen, however, Plaintiff must still present facts that the statements were on a matter of public concern. Plaintiffs make the blanket assertion that "the subject matter - physical abuse of a student by a public school principal- is a matter of public concern. (Doc. 44 at 20). In support of this position, Cottrell points to several non-binding cases from outside of the Eleventh Circuit.[5]  However, after reviewing each of the cases

---

[5] Specifically, Plaintiffs cite *Cioffi v. Averill Park*, 444 F.3d 158, 164 (2nd Cir. 2005); *Voigt v. Savell*, 70 F.3d 1552, 1562 (9th Cir. 1995); *Schultea v. Wood*, 27 F.3d 1112, 1119 (5th Circuit 1994); and *Meenan v. Harrison*, 264 Fed. Appx. 146, 150 (3rd Cir.

cited to by Plaintiffs, this Court reaches two conclusions (1) none of the cases are factually similar to the case at hand and (2) the conclusions implying that physical abuse of student is a matter of public concern were reached not solely by the subject matter alone, but by the proper analysis of the content, form, and context of the fact specific circumstances in those cases. As a result, this Court does not find Plaintiffs' argument compelling. While the subject matter of the speech in this action may be a matter of public concern the *Pickering* test requires an analysis of the true purpose of the speech. In the instant action, even assuming Cottrell was speaking as a citizen, there are no facts to suggest that Cottrell's purpose in making these reports was to raise an issue of public concern as the reports were made verbally to single individuals (superiors) with no obvious expectation of bringing the matter to public light. Accordingly, considering the record as a whole in a practical way, Cottrell's pre-testimony statements, verbal or written, were not made by a citizen on a matter of public concern and, therefore, not protected. Cottrell's court testimony will be further analyzed herein below.

### 2) James and Stacey Rigdon

The record reflects that J. Rigdon reported the incident between Ward and Chandler to Superintendent Kallhoff, Board Members McFall and Ham, and Office Administrator Jodie McPherson (Doc. 1 at 4; Doc 43-1; Doc. 43-11 at 4). The record does not contain the details of these reportings. It is also evident that J. Rigdon

2008).

brought up the incident to Lewis on September 25, 2014 following Lewis's reprimanding J. Rigdon for the state of his classroom. (Doc. 41-17 at 12-13) ("I understand you [W]ard work off intimidation and my son has [a]lready been slapped and since then you 2 have came by my room so much students have asked why you guys drop by so much but let me make it clear you guys do not intimidate me and never will.") J. Rigdon additionally brought up the incident in an email with another teacher, Grace Whit, (with Lewis and Ward copied) on October 8, 2015 in response to that teacher's email to Lewis regarding a uniform violation given to Chandler Rigdon. (Doc. 41-17 at 15)(" Let me also add for the record that YOU were the main person telling me that I should go to the cops on Brett [sic] [W]ard for what happened with chandler. Your exact words were if you don't he will go after you and chandler, funny how I did not listen and you are the one who are trying to do what you can do to go after chandler and I.") The evidence before this Court indicates that Stacey Rigdon reported the incident to the Alabama State Department of Education. (Doc. 1 at 4). No details relating to that reporting are a part of the record. A week after she reported the incident to the Department of Education, Ms. Rigdon also participated in a meeting with J. Rigdon, Kallhoff, and the attorneys for the School Board. (Doc. 1 at 4). The record does not contain the details of that meeting. Subsequently, S. Rigdon also brought up the incident in emails to Lewis on December 23, 2014, wherein the main topic was her son's suspension by Lewis ("I understand you are upset because Chandler took out a

police report on your friend Brent Ward but I'm gonna ask you to stop bullying and harassing my child and family."), and on March 18, 2015, wherein the main topic was Lewis's refusal to allow the Rigdons to sell pizza from their pizza business on school grounds ("yet you promote you[r] friend Brent Ward's family business. Your excuse to my husband is 'he doesn't work at Chickasaw,' Are you serious, We know he does not work in Chickasaw because he couldn't keep his hands off of children and keep from harassing a teacher, but you already know this. So you hurt my family while you promote Brent Ward's family's business. This is ABSOLUTELY astonishing, yet at the same time after you hid the fact that you knew Chandler was slapped by Mr. Ward it should not be too surprising."), and on May 6, 2015 where the main topic was a threatening letter written by a student ("Please STOP HARRASSING ME and MY FAMILY!!!!!!") (Doc. 1 at 6; Doc. 41-17 at 26, 28-29, 31). There is also mention on the record of the possibility that one or both of the Rigdons may have discussed the incident with a local newspaper, Call News, although the details of those discussions or the time period in which they were made are not stated.

Plaintiffs unequivocally state that "the Rigdon's regularly discussed their son being hit by Brent Ward and supported their son filing his police report" and that "their speech was on a matter of public concern" because physical abuse of a student by a public school principal is a matter of public concern. (Doc. 44 at 20, 22). Like Cottrell, the Rigdons do not address in detail whether or not they were speaking as

19

citizens, but cite several non-binding cases which tend to support their contention that the subject of the statements were a matter of public concern.[6] To support that their speech was not privately motivated, J. Rigdon and S. Rigdon have also each submitted an affidavit that states that they were not speaking out about the incident to improve their own self-interest. (Doc. 43-10, Affidavit of S. Rigdon: "…I did not instruct him [Chandler] to file it to gain any leverage related to my employment"; Doc. 43-11, Aff. of J. Rigdon: same.) Defendant asserts summary judgment is due to be granted because the Rigdons' speech did not address a matter of public concern and it is therefore, not protected.

Again, in order to determine whether the Rigdons' speech was protected, this Court must discern the purpose of the speech—that is, whether [they] spoke on behalf of the public as a citizen, or whether the employee spoke for [his/her]self as an employee. *Connick*, 461 U.S. at 146. To determine whether speech is a matter of public concern, a court considers "the content, form and context of a given statement, as revealed by the whole record." *Deremo v. Watkins*, 939 F.2d 908, 910 (11th Cir.1991) (citing *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690). A court may consider the employee's attempts to make the concerns public, along with "the employee's motivation in speaking." *Id*. at 911 (citations omitted). " '[T]he mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment.' " *Kurtz*, 855 F.2d at 727 (quoting

---

[6] See FN 5.

*Terrell v. University of Tex. Sys. Police*, 792 F.2d 1360, 1362 (5th Cir.1986), cert.

denied, 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987)). Rather, it must be

determined whether the purpose of the speech was to raise issues of public concern,

on the one hand, or to further private interest, on the other. *See Deremo*, 939 F.2d

at 912.

Plaintiffs' argument that "Plaintiffs exercised their right to free speech by

talking publicly about the assault on their child" (Doc. 44 at 22) tends to suggest

that any speech made by a citizen related to any matter that may potentially be a

concern of the public is protected. Such a contention is misguided and the correct

analysis requires a review of the purpose for which the speech was made. As to the

verbal statements made by S. Rigdon, i.e. reporting the incident to the Alabama

Department of Education, discussing the incident during a meeting, and generally

discussing the incident with unidentified people, there are no facts from which it

could be determined that her speech was protected because there are no facts in the

record providing details as to the content or context of these statements. At best,

the known facts suggest that S. Rigdon *may* have been acting as a citizen, but even

so, there is no indication that these statements were made in a public forum, for

non-personal reasons, or with the intent to raise public awareness. As discussed

herein above, once Defendants have shown a lack of material fact, it is Plaintiff's

burden to establish that she engaged in protected speech. *See Howard*, 32 F.3d at

524. In that regard, S. Rigdon has urged that the subject matter of her son's

incident - physical abuse of a student by a teacher- is carte blanche a matter of public concern and has filed an affidavit which indicates her motive was not to further her own interest. (Doc. 43-10). Such a blanket denial without supporting evidence does not overcome the lack of factual support that her speech was protected based on its content, form, and context.

With regard to the statements made by S. Rigdon in her emails to Lewis, the content, form, and context of those statements do not support that they were made by a citizen on a matter of public concern. Rather, the emails are clearly written to one individual, her superior, in a private manner and in response to other work-related incidents involving her or her husband. (Doc. 41-17 at 26-27,28-29, 31). The comments were also made after Ward was placed on administrative leave and had resigned and, therefore, when Ward was no longer on campus or having any contact with students. Further, while personal motive may not be wholly dispositive of determining the purpose of speech, a plain reading of the emails show that S. Rigdon was motivated, at least in part, because the child involved was *her* son. Lastly, the emails address multiple school-related issues for which S. Rigdon would not be involved or have knowledge of but for her position as an employee and only mention the incident as an aside to other matters. For all off these reasons, taken as a whole the facts taken in a light most favorable to her, do not show that S. Rigdon's speech was protected.

J. Rigdon's speech suffers the same shortcomings as S. Rigdon's speech.

Again, in response to Defendant's assertion that there is no dispute of material fact that J. Rigdon's speech was protected, J. Rigdon has failed to provide any facts which would establish otherwise. Like, S. Rigdon's verbal statements, the content and context of J. Rigdon's verbal statements are wholly unknown. The record provides no details as to on what dates the statements were made or the content of the statements from which the proper analysis would result in a conclusion that those statements, together or separate, are protected as a matter of law. Further, those statements which have been memorialized in emails between J. Rigdon and Lewis/Kallhoff show that the incident was brought up not as a topic issue, but as an aside to other matters being discussed based on J. Rigdon's role as a teacher, specifically in response to his being reprimanded by an administrator or having a conflict with another co-worker. (*See* Docs. 41-17 at 12, 15, and 16). Those statements were also made to only one individual, a superior, in private emails and some after Ward had been placed on administrative leave and was no longer on the school's premises. As such, the statements are not indicative of those made by a citizen, rather than a public employee, or for the purpose of raising public awareness, rather than to express a personal grievance. For these reasons, the record as a whole does not support that J. Rigdon's speech was protected as a matter of law.

### a. The Second *Pickering* Factor

There being no dispute that Cottrell's court testimony was protected and

even assuming arguendo that the Rigdons' speech was protected, the *Pickering* balance requires determining whether the public employee's interest in exercising a constitutional right outweighs the employer's interest in efficiency and the effective functioning of the office. *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35; *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899. The Supreme Court has identified a number of factors for courts to consider when performing the balance: (1) whether the employee's exercising rights "impairs discipline by superiors or harmony among co-workers"; (2) whether the employee's exercising rights "has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary"; and (3) whether the employee's exercising rights "impedes the performance of the [employee's] duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899 (citation omitted).

Defendant contends that both Cottrell's and the Rigdons' speech was disruptive to the efficient functioning of the school and therefore, even if it was protected, their claims should fail as a matter of law because the Board's interest in operating the school efficiently outweighs Plaintiffs' First Amendment rights. (Doc. 41 at 24-28). In support of its position, Defendant cites numerous occasions in which Cottrell, J. Rigdon, and S. Rigdon, individually interrupted the efficient functioning of the school by their rhetoric or behavior.[7] (*Id.*) In response, Plaintiffs

---

[7] Most of the instances have been included in the "Facts" section herein at pp. 3-5. There are however, instances that are not described in the "Facts" section of this opinion because they are not related to the incident and are only relevant to the

argue that the Board has intertwined the third and fourth factors of the *Pickering* analysis with the second factor. (Doc. 44 at 22). In that regard, Plaintiffs point out that "[t]he Board is not actually claiming that there is something sufficiently disruptive about the *actual speech in question* such that the Board would be justified in firing Plaintiffs for it." (*Id*.) For the most part, this Court agrees with Plaintiffs. Of the numerous instances brought forth by the Board showing the disruptive nature of the Rigdon's behavior, the only instances wherein Plaintiffs potentially engaged in protected speech are those occasions where the incident was mentioned in email correspondences (discussed previously herein). Thus, those are the only instances in which the second *Pickering* analysis should be applied. While the other examples of the Rigdons' behavior may be indicative of the Board's reason for non-renewing Plaintiffs, they offer no insight as to whether the Board's interest in maintaining an efficient workplace outweigh Plaintiffs' interest in the *protected speech*.

With regard to Cottrell, none of the disruptive instances referred to by Defendant relate to the incident or the protected court testimony, a point Defendant acknowledges. (Doc. 45 at 11). Accordingly, the interests of the Board in regulating Cottrell's speech does not outweigh Cottrell's First Amendment Rights. With regard to the conduct wherein the Rigdons' discussed the incident, they assert that "with the facts taken in a light most favorable to them, the worst that could be said is that

---

fourth *Pickering* factor, which this Court does not need to address.

25

they were frustrated both by the initial incident and by their supervisors' seeming desire to pretend that it never happened. Whether their frustration in that regard was expressed in ways that were actually disruptive justifying termination is, at most a question requiring resolution of disputed facts."[8] (Doc. 44 at 23). Plaintiffs' argument is not compelling. The second *Pickering* analysis is a question of law to be decided by this Court and of the instances involving the allegedly protected speech by Plaintiffs, Defendant has sufficiently established that the Rigdons' speech was disruptive to the efficient functioning of the school. Specifically, the email correspondences wherein J. Rigdon mentions the incident (discussed herein above) show a pattern of hostility, insubordination, and lack of professionalism all of which would have affected his ability to perform his duties as an employee. The same is apparent from the email correspondences from S. Rigdon (discussed herein above) wherein her rhetoric was accusatory and insubordinate with her superior. The emails additionally raised conflict with other staff members. (Doc. 41-17 at 14-15). Notably, the Rigdons have not responded or addressed in any manner the Board's position as to the second *Pickering* factor as it relates to the speech which the Rigdons allege was protected. Nevertheless, the record is clear that the Rigdons' speech relating to the incident was, in fact, disruptive to the functioning of the school because it interfered with the relationships with their co-workers and

---

[8] The question is not whether the speech justified termination. Rather, the question is whether the Plaintiff's interest in speaking outweighs the Board's interest in promoting the services it performs.

superiors and hindered the administration's ability to trust them as employees. As a result, this Court finds that even if the Rigdons' speech was protected –which it is not- their interest in said speech is outweighed by the Board's interest.

Accordingly, for the reasons stated herein above, Defendant's motion for Summary Judgment as to James and Stacey Rigdons' freedom of speech claim is granted. The analysis will continue with regard to Cottrell.

### b. The Third *Pickering* Factor

As for Cottrell's protected speech, his trial testimony, the third *Pickering* factor requires this Court to determine whether Cottrell has presented evidence of a material dispute of fact that the protected speech was a motivating factor in Cottrell's non-renewal such that summary judgement would not be appropriate. The Eleventh Circuit has stated that "[i]t is neither possible nor desirable to fashion a single standard for determining when an employee has met her initial burden of demonstrating that a retaliatory intent was a 'substantial' or 'motivating factor' behind a government employment decision." *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 (11th Cir.1995). "Rather, we examine the record as a whole to ascertain whether [Plaintiff] presented sufficient evidence for a reasonable jury to conclude that his protected speech was a 'substantial' motivating factor in the decision to terminate him." *Stanley v. City of Dalton, Ga,*. 219 F.3d 1280, 1291 (11th Cir. 2000) citing to *Beckwith*, 58 F.3d at 1564. The Eleventh Circuit, however, has also "identified several factors that are relevant in determining whether

protected speech was a "substantial" motivating factor in an adverse employment decision: (1) whether temporal proximity exists between the employment action and the protected activity; (2) whether any reasons for the employment action are pretextual; (3) whether any comments made, or actions taken, by the employer indicate that the employment action was related to the protected speech; (4) whether the asserted reasons for the action vary; and (5) any circumstantial evidence of causation." *Potter v. City of Miami*, 2015 WL 11233079 *5 (S.D. Florida June 5, 2015) (citing to *Stanley*, 219 F.3d at 1291 n.20 (11th Cir. 2000) (quotation marks omitted).

Cottrell asserts that his speech was a motivating factor in his termination. In support of his position, Cottrell points out that (1) the majority of the Board was aware of the incident because they had heard of it either from the press, the community, or directly from Kallhoff, (2) the incident was widely talked about, (3) Kallhoff did not want bad "PR" for the school system and wanted to control any mention of the school system in the press because bad press reflected badly on him and the Board, and (4) Kallhoff and other administrators worked to minimize any negative impact the incident had on the school system and acted to keep Cottrell from testifying as a witness and that once charges were filed and Ward resigned, Kallhoff, Ruffin, and Lewis continued to harass Plaintiffs making it clear they wanted them "gone from Chickasaw" until their eventual recommendations for termination from Kallhoff to the Board.  (Doc. 44 at 23) (internal citations omitted).

Despite Plaintiff's burden being low at this stage, Cottrell has not presented any evidence that would create an issue of material fact that his protected speech was a substantial factor in his ultimate termination. Even considering the speech which this Court has previously found to be unprotected, i.e. the verbal and written statement prior to Cottrell's testimony, Plaintiff has not presented facts that the speech and the non-renewal are causally linked. Specifically, Cottrell has not pointed to any comments made by the Board or Kallhoff that suggest his speech was a factor, much less a substantial one, in his termination. There is no evidence that the reasons for his non-renewal varied. Moreover, it is undisputed that the protected trial testimony had not yet occurred when Cottrell was non-renewed by the Board and the record is devoid of any comments suggesting Cottrell should not testify or may be looked on with disfavor if he testified in the future. Further, during his deposition testimony in this action, Cottrell indicated that (1) he did not know of any instance when a Board member influenced the alleged harassment or disparate treatment, (2) he had no knowledge of a Board member ever telling an employee to discriminate or harass him for any reason, and (3) he had no knowledge of a Board member ever saying that he would be fired for testifying in the Brent Ward case. (Doc. 41-10 at 6). Cottrell has identified a number of encounters with Kallhoff and/or Lewis which he believes were pretextual in nature (Doc. 44 at 24). Namely, in an effort to create a question of fact, Cottrell disputes a number of allegedly unprofessional instances that were on a list drafted by Kallhoff entitled

"Unprofessional Behavior". (Doc. 41-17 at 10). However, while Cottrell disputes whether the actions listed were unprofessional, he does not provide any facts that they did not occur. For example, Cottrell states one listed item was an unsanctioned football practice witnessed but not stopped by Lewis and Athletic Director Ruffin. (Doc. 44 at 24). While Cottrell disputes whether the incident was worthy of reprimand, he does not dispute that there was, in fact, an unsanctioned football practice. Another noted incident involved Cottrell having helmets reconditioned and Cottrell disputes it was unprofessional because he is required as a coach to have the helmets reconditioned. (Doc. 44 at 17-18). However, he does not dispute that he had to follow proper accounting procedures to have them reconditioned, the reason that he was reprimanded on that occasion. (Doc. 41-17 at 5). While Cottrell states that "all of the allegations in Kallhoff's document are disputed" he has not shown that they were pretextual based on his protected court testimony which had not yet occurred. As a result, Cottrell has not presented evidence of a disputed material fact to show that his protected speech was a substantial motivating factor in his non-renewal and summary judgement is due to be granted[9].

### D. Count Two: Violation of First Amendment Right to Freedom of Association

---

[9] Plaintiffs additionally assert they Cottrell need not establish retaliatory motivation on the part of the Board because entity liability in this action is established by the retaliatory actions of the superintendent, Kallhoff. Because this argument pertains to all Plaintiffs equally, this Court will address this argument herein below as to all Plaintiffs at pp. 35-39.

The Rigdons alternatively argue that they need not establish that their speech was protected because they have asserted a freedom of association claim and "freedom of association claims do not require a showing of public concern." (Doc. 44 at 23 *citing to Bouldin v. Troy City Board of Ed.*, No. 2:13-cv-898-JA-GMB, Doc. 70, P.19 (M.D. Ala. July 19, 2016)("In the Eleventh Circuit, 'public concern' is not part of the analysis of a freedom of association claim, regardless of whether that claim is an expressive association claim or an intimate association claim"). Defendant contends that a freedom of association claim fails for the same reasons that Plaintiffs' freedom of speech claim fails because *Garcetti* still applies to freedom of association claims and therefore, it still requires analysis pursuant to *Pickering*. (Doc. 45 at 2). Neither party is wrong.

A right of free association is implicit in the First Amendment. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). There are two types of protected association: association involving "intimate human relationships" and association to engage "in those activities protected by the First Amendment." *Id*. at 617–18. Intimate association concerns those relationships inherent to a family structure. *See McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir.1994) (stating that "[a]t a minimum, the right of intimate association encompasses the personal relationships that attend the creation and sustenance of a family."). Expressive association, on the other hand, relates to protected rights such as "speech, assembly, petition for redress of grievances, and the exercise of religion." *Id*.

31

James and Stacey Rigdon have argued they have both an intimate and expressive association claim. The former being based on their relationship with their son and the latter being based on the support of their son in pursuing charges against Ward. (Doc. 44 at 23). In support of their position, Plaintiffs rely solely on *Bouldin* wherein the Middle District of Alabama found that freedom of association claims do not require a showing of public concern and state "[t]he Board has made no argument to show that termination because of their *association* would be constitutionally permissible." (Doc. 44 at 23). Defendants correctly point out, however, that in reaching its conclusion the District Court in *Bouldin* cited *D'Angelo v. School Bd. Of Polk County, FL*, 497 F.3d 1203, 1212 (11th Circuit 2007). The pertinent language in *D'Angelo* states as follows:

> We have long held that, unlike speech or petitions by public employees, associational activity by public employees need not be on matters of public concern to be protected under the First Amendment. See, e.g., *Hatcher v. Bd. of Pub. Educ. & Orphanage*, 809 F.2d 1546, 1558 (11th Cir. 1987); *Cook v. Gwinnett County Sch. Dist.*, 414 F.3d 1313, 1320 (11th Cir. 2005) (citing *Hatcher*). But see, *e.g., Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004) (associational conduct by public employee must touch on matter of public concern); *Klug v. Chi. Sch. Reform Bd. of Trs.*, 197 F.3d 853, 857 (7th Cir.1999) (same); *Boals v. Gray*, 775 F.2d 686, 692 (6th Cir. 1985) (same). We explained in *Hatcher* that "application of a requirement that associational activity relate to a matter of public concern in order to be constitutionally protected would overturn Supreme Court and Eleventh Circuit jurisprudence," such as *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). *Hatcher*, 809 F.2d at 1558.
>
> **The question is whether the holding in *Garcetti* nevertheless applies to public employees who argue that they were terminated for exercise of their right to free association and requires those public employees to have engaged in associational activity *as citizens* to be protected under the**

**First Amendment. We conclude that it does**.

*D'Angelo*, 497 F.3d at 1212 (emphasis added). Accordingly, Plaintiffs are correct that [t]he Eleventh Circuit does not require Plaintiffs to demonstrate that their claimed freedom of association pertains to matters of public concern." *Thomas v. McKee*, 205 F.supp.2d 1275, 1284 (M.D. Alabama February 11, 2002) citing to *Hatcher, supra* at 1558. However, the inquiry does not simply end. Defendant is also correct that the freedom of association claim must still be analyzed under the proper test and this Court agrees that based on the factual assertions in this case, the *Pickering* analysis is the proper test. *See Cook v. Gwinnett*, 414 F.3d 1313, 1318 (11th Cir. 2005)("[i]n analyzing free association claims in this context, we do not apply the public concern portion of the *Pickering* analysis. (citation omitted). We do, however, apply the *Pickering* balancing test. (citation omitted); *See also Shahar v. Bowers*, 114 F.3d 1097, 1103 (11th Cir. 1997) (en banc) (applying *Pickering* in the intimate-association context); *Starling v. Bd. of Cnty. Comm'rs*, 602 F.3d 1257, 1260 (11th Cir. 2010) (applying the *Pickering* balance to a claim that intimate association right was burdened). Therefore, in analyzing whether a government employee's freedom of association rights have been infringed involves a three-part test.[10] *Green*

---

[10] Defendant's argument that the application of the *Pickering* analysis defeats the Rigdons' freedom of association claim misses the mark in part because Defendant still focuses on whether the associative action was on a matter of public concern, a factor which is not required in freedom of associations claims. While Defendant argues that the Rigdons' freedom of association claim still fails because they were not acting as citizens the Court did not determine that none of the Rigdons' statements were made in their capacity as citizens because it was clear that even if

*v. City of Montgomery*, 792 F.Supp. 1238, 1252 (M.D. Ala. 1992). The first step is for the court to balance an employer's interest in maintaining an efficient workplace against the weight accorded to the employee's First Amendment rights. *Pickering* 391 U.S. at 568. If the First Amendment interest is of sufficient importance, Plaintiffs then have the burden of showing that the protected activity "was a substantial motivating factor in the" decision not to promote them. *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993) (internal quotations omitted). If Plaintiffs demonstrate this, the burden shifts to Defendants to prove by a preponderance of the evidence that they would not have promoted Plaintiffs, even in the absence of the protected conduct." *Mt. Healthy*, 429 U.S. at 287. In the instant action, there is no dispute that James and Stacey Rigdon are the parents of Chandler Rigdon or that a parent-child relationship is intimate association. There is also no dispute that Chandler Rigdon filed a police report against Ward and that the Rigdons were both ultimately non-renewed by the Board. There is no argument that the state's interest in maintaining an efficient workplace outweighs the constitutional right of a parent to associate with their child. Therefore, the only question is whether Plaintiffs have established a question of material fact exists that their association with their son was a "substantial motivating factor" in the decision to non-renew them.

---

they were acting as citizens they were not speaking on a matter of public concern. Thus, the Court's conclusion in Section C(2), does not automatically foreclose the Rigdons' freedom of association claim and the Court will continue with the relevant *Pickering* analysis on this claim.

Defendant argues that in the instant case the evidence is undisputed that the both the Rigdons' speech[11] and their association was not a substantial motivating factor in their non-renewal. Defendant makes this argument because Plaintiffs did not file this lawsuit against any of the individuals who Plaintiffs have alleged harassed or retaliated against them, namely Lewis, Kallhoff, or Ruffin. Rather, Defendant posits that Plaintiffs have sued only the Board and there is no evidence whatsoever that the Board based its decision to non-renew the Rigdons on retaliatory motives.[12]

Plaintiffs do not dispute that the Board is the only defendant or that there is no evidence of a policy or custom at issue in this action. There is, likewise, no evidence that the Board, itself, acted with retaliatory motivation. In fact, all three board members who voted in favor of non-renewal have been deposed and testified as to their reasons for voting the way they did after the Rigdons were recommended for non-renewal by Kallhoff, none of those reasons included retaliatory motivation. (*See* Doc. 41-6 at 51-58; Doc. 41-7 at 52-54; Doc. 41-8 at 45, 47-48, 51-52). Lastly, the Rigdons' discovery responses do not offer any evidence that the Board acted

---

[11] This Court has already determined that the Rigdon's speech is not protected and that their interest in the relevant speech does not outweigh that of the interests of the Board. Nevertheless, if this Court had concluded that their speech was protected, this third *Pickering* analysis would apply both to the Rigdons' freedom of speech and freedom of association claims under the First Amendment.

[12] The fact that the superintendent is not named as a party in his official capacity is not determinative of whether the Board can be held liable for his actions. In fact, this action was previously dismissed against a different superintendent in her official capacity because such an action was redundant of an action against the Board. (*See* Doc. 19 at 15).

with retaliatory motivation. (Doc. 41-12 at 4-8; Doc. 41-13 at 3-7). Nevertheless, Plaintiffs argue that it is not necessary for the Board or its members to exercise retaliatory motivation because "the Superintendent is enough to create liability on the facts of this case". (Doc. 44 at 18).[13] More specifically, Plaintiffs assert that entity liability can arise from those who have the authority to make final policy on behalf of the entity. (Doc. 44at24). In that regard, Plaintiffs posit that the superintendent and the Board are "co-equal" in terms of authority because the Board cannot act without the recommendation of the superintendent and therefore, "neither can create a policy without the other's approval." (*Id*.) Plaintiffs further argue that "entity liability can arise, as well, from even a single action by an officer with final policy making authority over the type of decision in question." (*Id. citing to Pembaur v. Cincinnati*, 475 U.S. 469, 480-82 (1986).) Plaintiffs then argue that because terminating a school board employee requires both a recommendation by the superintendent and a vote by the Board, therefore, making the superintendent a final policymaker that could bind liability. (Doc. 44 at 24).

Liability can attach to the Board only if the alleged retaliation by its employee was caused by an "official policy" or "custom" of the Board. *See Monell v. Dep't of Social Serv.*, 436 U.S. 658, 690-92 (1978). Otherwise, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish

---

[13] Plaintiffs assert this position with regard to both the Rigdons and Cottrell. Therefore, despite this Court's analysis in Section C(1)(b), this analysis will also be considered with regard to Cottrell.

municipal policy with respect to the action ordered. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (majority opinion) (footnote omitted). The Eleventh Circuit "has interpreted *Monell 's* policy or custom requirement to preclude § 1983 municipal liability for a subordinate official's decisions when the final policymaker delegates decisionmaking discretion to the subordinate, but retains the power to review the exercise of that discretion." *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997). Thus, "[f]inal policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review." *Id.* at 1401.

Plaintiffs have not shown that final policy making authority vest in the superintendent with regard to terminations of board employees because it is apparent that the superintendent's recommendation, as the decisionmaker, is subject to meaningful administrative review. *See* Ala. Code. § 16-24C.

Plaintiffs alternatively contend that because three of the five board members did not question the superintendent's recommendations to non-renew Plaintiffs, that the Board essentially rubber-stamped Kallhoff's recommendation which effectively made him the final policymaker. In support of their position, the Rigdons point to the deposition testimony of Broadhead, Grizzle, and McFall, the three board members who voted in support of non-renewal, to show that they did not question Kallhoff's motive for his recommendation in any way because they

37

believed it was the job of the superintendent to run the school, not the Board.  (See Doc. 44 at 26).  For legal support, Plaintiffs rely heavily on *Maschmeier v. Scott*, 269 Fed. Appx. 941 (11th Cir. 2008), which Plaintiffs parenthetically describe as "discussing the possibility of establishing entity liability under § 1983 by proving that governing body merely rubber-stamps the employment decisions of another official".  (Doc. 44 at 25). Relying on *Maschmeier*, Plaintiffs assert that "[a] finder of fact could therefore conclude that a majority of this Board, as a matter of philosophy, custom, and practice, engaged in no meaningful review [… and] [a] finder of fact could readily find that this amount[s] to a delegation of final authority, to a lack of meaningful review, and to a rubber-stamping process that yields entity liability based on the acts and motivation of the Superintendent."  (Doc. 44 at 26). The entire text referred to by Plaintiffs in *Maschmeier* states as follows:

> A municipal official is not a final policymaker when his or her decisions are subject to meaningful administrative review. *Scala*, 116 F.3d at 1401. Automatic review of the official's decisions is not required for the review to be meaningful; an opportunity for meaningful review is sufficient. *Id*. at 1402. When a council or board has the power to review and reverse a municipal official's decision, final policymaking authority does not vest in the official. *See Id*. (holding that a city manager and his subordinate were not final policymakers in regard to plaintiff's termination because a civil service board had the authority to review the termination); *Quinn v. Monroe County*, 330 F.3d 1320, 1326 (11th Cir.2003) (finding that the career services council's power to review the county administrator's termination decision deprives the county administrator of final policymaking authority); *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 637 (11th Cir.1991) (holding that the city council's ability to override the mayor's veto in regard to zoning issues meant that the mayor was not the final policymaker for zoning decisions). The plaintiff can try to demonstrate that the board's review is not meaningful, such that the official should be considered the final

> policymaker. *See Quinn*, 330 F.3d at 1326; *Scala*, 116 F.3d at 1402. **To succeed in such an argument, the plaintiff would need to show that the board has defective procedures, merely "rubber stamps" the official's decisions, or ratified the official's decision and improper motive.** ***See Quinn*, 330 F.3d at 1326; *Scala*, 116 F.3d at 1402. However, the existence of a reviewing board has generally been sufficient to find that the official in question did not have final policymaking authority**. *See, e.g., Quinn*, 330 F.3d at 1326; *Morro*, 117 F.3d at 514; *Scala*, 116 F.3d at 1402-03.

*Maschmeier* at 944 (emphasis added). Plaintiffs have not shown that the superintendent was the final policymaker in the instant action because it is undisputed that the recommendation of the superintendent must be approved via a majority vote of the Board before becoming final. Moreover, there are no facts to suggest that the Board terminated Plaintiffs without review or that the review was somehow deficient or only a matter or "rubber-stamping" by the Board. Rather, the record reflects that the recommendations of Kallhoff with regard to Plaintiffs were narrowly approved by the Board in a three to two vote. As such, Plaintiffs' argument that there was no meaningful review is not compelling. While Plaintiffs argue that every single one of the board members did not review Kallhoff's recommendation in this case, it is clear that they had an opportunity to review the recommendations and, in fact, two of the members both reviewed and rejected Kallhoff's recommendation. As a result, in this action, Plaintiffs have not shown that Kallhoff was a final policy maker by way of the Board simply rubber-stamping his recommendations, such that liability exists without evidence of retaliatory motivation caused by an "official policy" or "custom" of the Board.

Because Plaintiffs' effort to impose liability on the Board by way of Kallhoff's actions is not compelling, there remains no evidence from which it could be determined that Plaintiffs' speech or association was a substantial factor in their being non-renewed. Accordingly, the Rigdons' freedom of association claim fails.

Further because this Court has determined that all of Plaintiffs' claims fail based on the analysis set forth herein above, it is unnecessary for the Court to determine whether a question of material fact exists on Defendant's position that it would have terminated Plaintiffs despite their allegedly protected behavior, step four of the *Pickering* analysis.

CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is **GRANTED.**

**DONE** and **ORDERED** this 7th day of February 2018.

/s/ Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE